STATE of Missouri, Respondent,

v.

Zachary A. SMITH, Appellant.

No. WD 52816.

Missouri Court of Appeals,
Western District.

Oct. 21, 1997.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Nov. 25, 1997.

Application for Transfer Sustained
Jan. 27, 1998.

Case Retransferred May 26, 1998.

Court of Appeals Opinion Readopted
June 2, 1998.

**2**

Rosemary E. Percival, Asst. Appellate Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before ELLIS, P.J., and LOWENSTEIN and HOWARD, JJ.

ELLIS, Presiding Judge.

Zachary A. Smith appeals from his conviction by jury of murder in the first degree, § 565.020.1,[1] and armed criminal action, § 571.015.1. Smith was sentenced to concurrent terms of life imprisonment without the possibility of probation or parole on the murder conviction and 100 years on the armed criminal action conviction.

The evidence adduced at trial revealed the following. About ten o'clock on the evening of June 23, 1995, Smith left his father's home at 411 Indiana in Kansas City, Missouri and started driving around in a borrowed, maroon Buick with Kevin Glavin and Jose Sosa. Ultimately, the three men stopped at the K.C. Oil Station to buy some cigarettes. While they were there, Derek Hoskins rode up on his bicycle.

Several weeks earlier, Hoskins had confessed to stealing Smith's lawnmower. Hoskins had promised to pay Smith back for the lawnmower, but never did. About a week prior to the night in question, Smith showed Hoskins a pistol he was carrying and told him, "You better get my money."

When Hoskins rode up to the gas station on his bicycle, Smith asked if he had the money that he owed him. Hoskins said that he did not have the money, but could probably borrow it from his cousin, Tyrone, if the three men would follow him to Tyrone's

house. Smith cocked his gun and told Hoskins that it would be better if they all drove to Tyrone's house. Hoskins bicycle was placed in the trunk of the car, and the group drove to Tyrone's home. Once there, Hoskins spoke with Tyrone's younger brother, Glenn Hemmingway, who told him that Tyrone was not home.

After Hoskins got back in the Buick, Smith told him that he could work off the debt by burglarizing a house. Hoskins agreed. The group then drove to Smith's house at 1901 Lawn, where Smith took Hoskins' bicycle out of the trunk and placed it in the yard. Smith next drove the group to a house, where Hoskins and Glavin got out of the car. Hoskins knocked on the door, and when nobody answered, he kicked in the door and entered the house. Hoskins made two trips into the house taking a television set and a stereo, both of which he placed in the trunk of the Buick. The men returned to 1901 Lawn and dropped off the television and stereo. Smith then informed Hoskins that he would have to commit another burglary to fully repay the debt.

Smith drove the group to the northeast part of the city, where they stopped to buy some beer. After driving around for about half an hour, Glavin told Smith he needed to urinate in an area called Cliff Drive. Smith stopped the car under a streetlight, but then backed the car out of the light. Glavin got out of the car and Hoskins decided he too needed to urinate, and also got out of the car. As Hoskins and Glavin stood by the curb urinating, Smith got out of the car and stood behind and in between the two. Glavin then heard a gunshot, looked up, and saw a bright flash. He saw Smith holding a pistol about one to two feet away from Hoskins. Hoskins went limp and fell to the ground. After Smith and Glavin got back in the car, Smith fired another shot out the window at Hoskins' body.

Smith then drove back to 411 Indiana where he and his girlfriend, Cynthia Frost had been living for about a month due to plumbing problems in their house at 1901

1. All statutory references are to RSMo 1994 un-    less otherwise noted.

Lawn. Smith handed his gun to Frost and told her to "put this up."

About sunrise the next day, the three men went to the house of Sosa's girlfriend, Rose Marie Sanchez. Sanchez later told the police that Smith had arrived in a newer, four-door, burgundy or red car and had a gun tucked into his waistband. Smith was the only one she saw with a gun. Later that morning, Catherine Stone looked out her window at 409 Indiana and saw Smith standing next to the maroon car. Smith noticed Stone and told her that if "you guys going to watch all the time [sic], you guys could get hurt if you guys snitch or anything."

The following day, as Glavin was driving past 411 Indiana, Smith and his father motioned for him to stop. Smith took Glavin to his bedroom and showed him Hoskins' bicycle which was now covered in black tape. Smith told Glavin that he was going to give away the bicycle. Glavin asked Smith if he had planned on killing Hoskins and whether Sosa knew anything about it. Smith told Glavin that it had been his idea and Sosa didn't know anything about it. Smith later gave the bicycle to 11–year-old Jacob Cordry, who was visiting the house at 411 Indiana.

Between three and four o'clock on the morning of June 24, 1995, two security officers patrolling in the area of Cliff Drive heard gunshots. Later, a man reported that he had seen someone lying in the street who appeared to be hurt. Security officers went to the scene where they found Hoskins' corpse.

When Detective Ron Payne, a crime scene technician, arrived several hours later, he found Hoskins' body lying in the street with his head facing south and the snap of his shorts unfastened. On the ground, Payne found two spent bullets and two shell casings marked "GFL ACP 45."

An autopsy of Hoskins revealed that Hoskins' death was caused by a gunshot wound to the right temple region. The bullet entered his head from the front and penetrated his brain at a forty-five degree angle. The bullet exited from the left side of his upper neck. Hoskins was also wounded by a cluster of five superficial, slit-like cuts in the upper left chest and an abrasion consistent with a ricochet shot.

When police learned that Jacob Cordry had Hoskins' bicycle, they went to 411 Indiana to question Jacob and his mother. When officers returned to question them a second time, Smith ran and hid. The detectives searched the house and confiscated the bicycle.

On June 26, 1995, a police detective recovered two shell casings in front of Smith's house at 1901 Lawn. One of the casings was located on the south side of the sidewalk in front of the steps leading to the house. The other casing was on the north side of the sidewalk. Both casings were stamped "Federal 45."

On June 27, 1995, a police officer spoke with Lori Stone, who lived next door to 411 Indiana. She told the officer that two weeks prior to Hoskins' death, she had seen Smith fire a black .45 caliber handgun into the air twice. The officer then recovered two shell casings from the west side of the street, near the curb in front of Stone's house. Both shell casings were marked "Federal 45 auto." Cathy Stone, Lori's sister, later told officers that she too had seen Smith go out by the fence, near the alley and shoot his gun in the air.

Police detectives Roger Lewis and Mark Heimer also spoke with Cynthia Frost. During that interview, Frost told the detectives that she owned the property at 1901 Lawn, which she had purchased with money from her parents. Frost told the detectives that she and Smith had temporarily moved into 411 Indiana because of plumbing problems at 1901 Lawn.

On June 27, 1995, detectives asked Frost to sign a consent to search form for 1901 Lawn, and she complied. Frost then accompanied the detectives to the house and told them to park toward the rear of the house. Frost informed the detectives that the front door was partially broken and that she had nailed it shut the previous day. Frost opened the front door for the detectives by banging her fist against it and kicking it.

The detectives then entered the house and searched it.

In one of the bedrooms, the detectives found Smith's driver's license and some personal papers. They also found a locked safe in the bedroom. The detectives carried the safe out to the front porch where they forced it open using a hammer, a crowbar, and a heavy-duty screwdriver. Inside the safe, the detectives found seven live .45 rounds. Four were marked "GFL 45 ACP," and three were marked "Federal 45 auto."

Also on June 27, 1995, Glavin was arrested for stealing cigarettes from a store in Clay County. While at the Clay County Jail, Glavin was questioned about Hoskins death. Glavin denied any knowledge of the murder and said that he, Smith, and Sosa were at Florence Brown's house that night.

On June 29, 1995, Glavin was informed that he was being charged with murder in the first degree and armed criminal action. After consulting with his attorney, Glavin arranged to talk with a police detective. Glavin gave the police a video-taped statement implicating Smith in the murder.

Later that day, Smith was questioned by police. After receiving and waiving his *Miranda* rights, Smith told the police that on the evening of June 24, 1995, he had gone bowling with several friends. He said that he and his friends had then gone to 411 Indiana, where they remained until 11 o'clock the next morning. Smith denied owning a gun, claimed not to know Glavin, and stated that he had not seen Hoskins for a month. He also told police that he did not have Hoskins' bicycle, he had not been in a maroon car, and had not been to Cliff drive in at least three to four months. He could not explain why shell casings from the crime scene matched casings from outside his house.

On June 30, 1995, the police examined the Buick for fingerprints. A print taken from the interior of the driver's side front door matched Smith's left middle finger. In addition, William Newhouse, a firearms and tool mark examiner with the Kansas City Regional Crime Laboratory, examined the shell casings and bullets collected during the investigation of Hoskins' death. After examining the two shell casings found at the crime scene, the two casings found at 1901 Lawn, and the two casings found at 411 Indiana, Newhouse determined that all six casings had been fired from the same .45 caliber pistol. Newhouse also determined that the bullets recovered from the crime scene were fired from the same pistol. One of the bullets was "flattened," consistent with a ricochet off the pavement. The recovered bullet fragments also indicated a ricochet.

Smith was tried by jury in the Circuit Court of Jackson county and found guilty of murder in the first degree and armed criminal action on March 28, 1996. On May 8, 1996, he was sentenced to concurrent terms of life without the possibility of probation or parole and 100 years' imprisonment. Smith brings four points on appeal. Since we conclude his point three is dispositive and compels reversal, we need not address all points raised.

In his third point, Smith contends the trial court erred in refusing to submit to the jury his proposed instruction for the lesser included offense of second degree murder, patterned after MAI–Cr 3d 313.04 and 304.02, and the corresponding instruction for armed criminal action, patterned after MAI–Cr 3d 332.02 and 304.02.[2]

Smith was charged by indictment with first degree murder. Murder in the first degree requires that a person knowingly cause the death of another person after deliberation upon the matter. § 565.020.1. Murder in the second degree is a lesser included offense of murder in the first degree. § 565.025.2(1)(a); *State v. Stepter,* 794 S.W.2d 649, 652 (Mo. banc 1990). To prove murder in the second degree, the State must show the defendant "knowingly cause[d] the death of another person or, with the purpose of causing seri-

---

2. The crime of armed criminal action is committed in connection with the crime of first or second degree murder if the death was caused by, with, or through the use, assistance, or aid of a dangerous instrumentality or deadly weapon.

§ 571.015.1. Smith's proposed armed criminal action instruction provided for a conviction in connection with the offense of murder in the second degree.

ous physical injury to another person, causes the death of another person." § 565.021.1(1). The element distinguishing first and second degree murder is deliberation. *State v. Santillan*, 948 S.W.2d 574, 576 (Mo. banc 1997); *Stepter*, 794 S.W.2d at 652. For purposes of first degree murder, deliberation is defined as "cool reflection for any length of time no matter how brief." § 565.002(3).

"A defendant is entitled to an instruction on a lesser included offense only if there is an evidentiary basis for both acquittal for the greater offense *and* conviction for the lesser offense." *State v. Kobel*, 927 S.W.2d 455, 461 (Mo.App. W.D.1996) (emphasis in original). Thus, the pertinent question is whether the evidence, in fact or by inference, provides a basis for both an acquittal of first degree murder and a conviction of second degree murder. *State v. Steward*, 936 S.W.2d 592, 594 (Mo.App. E.D.1996). In most homicide cases, the defendant is entitled to a second degree murder instruction if requested. *Santillan*, 948 S.W.2d at 576; *State v. Mease*, 842 S.W.2d 98, 112 (Mo. banc 1992). This is particularly so where the evidence of deliberation is contradictory and confusing. *Mease*, 842 S.W.2d at 112. Since deliberation is a mental state and difficult to prove through direct evidence, it may be established by indirect evidence and inferences reasonably drawn from the circumstances surrounding the offense. *Santillan*, 948 S.W.2d at 576.

> In most cases, indirect evidence of deliberation also supports a finding of lack of deliberation. A jury may draw different inferences from the facts on the issue of whether the defendant deliberated. Deliberation is, therefore, a question of fact for the jury and a second degree murder instruction is usually warranted.

*Id.* (citation omitted).

In the case at bar, the State relies on *State v. Olson*, 636 S.W.2d 318 (Mo. banc 1982), for the proposition that an instruction on a lesser-included homicide offense is not required unless there is some affirmative evidence of a lack of an essential element of the higher offense which would not only have authorized acquittal of the greater crime, but would have supported a conviction of the lesser

offense. The State's reliance on *Olson* is misplaced. Since the instant appeal was argued and submitted, the Missouri Supreme Court handed down its unanimous decision in *State v. Santillan*, 948 S.W.2d 574 (Mo. banc 1997). In *Santillan*, the court reversed the defendant's convictions for murder in the first degree and armed criminal action because the trial court erred in refusing to give the defendant's tendered second degree murder instruction. In so doing, the Court overruled *Olson* and its progeny.

> The state claims that because appellant's defense was limited to evidence of his innocence, he was not entitled to a second degree instruction. Section 556.046.2, however, requires only that there be a basis for the jury to acquit on the higher offense in order for the court to submit an instruction for the lesser included offense. If a reasonable juror could draw inferences from the evidence presented that the defendant did not deliberate, the trial court should instruct down. The defendant is not required to put on affirmative evidence as to lack of deliberation to obtain submission of a second degree murder instruction. *To the extent that Olson and Chambers may be read to require a defendant to put on affirmative evidence as to the lack of an essential element of the higher offense, they are overruled.*

*Id.* at 576 (emphasis added).

In *Santillan*, the Court described the following as the physical evidence upon which the jury could have determined the defendant to be the murderer. The defendant's friends saw him with a loaded .44 Magnum pistol two days before the victim was killed. On the morning of the victim's disappearance, the victim told his father and a friend the defendant was picking him up and they were going out for something to eat. Telephone records revealed a cellular call to the victim's residence at about the time the victim had said he was to be picked up by the defendant. The victim departed and never returned. His body was found partially buried near his and the defendant's homes about a month later. He had been shot twice with a .44 caliber pistol. A bullet jacket fragment recovered from the victim's body was consis-

tent with ammunition seized from the defendant's house, and with a sample fired from a .44 Magnum pistol seized at the same time. Blood found in a car owned by the defendant's family and often driven by the defendant matched the victim's blood. Glass recovered from the car was indistinguishable in many ways from glass found at the location where the victim's body was found.

The Court then described the State's evidence of the defendant's mental state, noting that to convict for first degree murder, the jury was required to find beyond a reasonable doubt that the defendant acted with deliberation. This evidence consisted of the testimony of several witnesses who stated that the defendant and the victim were friends, and both were interested in dating the same girl, Missy. Several months before the killing, Missy and the victim witnessed the defendant put a gun to his head. Missy testified that when he did so, the defendant stated that " 'he could not stand the fact that one of his best friends was in love with the same girl he was.' " *Id.* at 575. She also testified that six days before the victim's disappearance, the defendant drove her to the victim's house so she could talk to the victim. The defendant told her to call him when they were finished talking and he would drive her home. When she called and told the defendant that she and the victim had "made up," the defendant refused to pick her up. In addition, the State emphasized that the victim was shot twice, there was no call for medical attention, and the fact that the victim was partially buried.

Upon this evidence, the Court concluded that a reasonable juror could find that the defendant deliberated, but that "a reasonable juror could also find that the evidence did not prove deliberation beyond a reasonable doubt but was sufficient to find that the [defendant] had the requisite mental state for second degree murder." *Id.* at 576. The Court observed that the evidence of the relationships of the victim, the defendant and Missy could permit a reasonable juror to infer that the defendant acted with deliberation, but could also permit the rational fact finder to conclude he knowingly caused the death but did not deliberate. Likewise, the Court not-

ed that failure to call for medical attention and burial of the body could cause an inference of deliberation, but could also cause a reasonable juror to infer only a cover-up after the death. The Court further stated that the fact that the victim was shot twice was insufficient to establish deliberation. The Court then concluded:

> In summary, if there is any doubt upon the evidence, the trial court should resolve any doubts in favor of instructing on the lower degree of the crime, leaving it to the jury to decide which of two or more grades of an offense, if any, the defendant is guilty. Although there is an occasional case in which all of the evidence supports a finding of deliberation and no reasonable juror could conclude otherwise, . . . this is not that case.

*Id.* at 577 (citations omitted).

*Santillan* makes clear that it is a rare murder case where a second degree murder instruction will not be required if requested. Indeed, the only factual circumstances suggested by the Court as justifying failure to give the lesser included instruction were those in *State v. Mease*, 842 S.W.2d 98 (Mo. banc 1992). The *Santillan* Court described those facts as follows:

> [T]he evidence showed that the defendant planned the murder of one of his victims for three months in advance of the killing. He acquired a variety of weapons and ammunition and told his girlfriend that he was going to kill one of the victims. Defendant's girlfriend dropped him off in the woods near the victims' cabin, where defendant, dressed in camouflage, scouted the area for a full day. Defendant constructed a blind and lay waiting for several hours for the victims to emerge from the cabin. Defendant shot each of the three victims from afar, then shot each of them once more in the head at close range.

*Santillan*, 948 S.W.2d at 576. While the Court recognized there could be factual settings which would preclude the necessity of giving the second degree murder instruction, it emphasized that it is only in the relatively small number of cases such as *Mease* where there is no contradictory or confusing evidence of deliberation, meaning, in effect, only

in those instances when a reasonable juror could not draw different inferences from the facts presented on the issue of whether the defendant deliberated.

■ In the case *sub judice*, the jury reasonably could have drawn different inferences from the facts on the issue of whether Smith deliberated. As in *Santillan*, the evidence of mental state could be interpreted by the jury as evidence of deliberation. However, a reasonable juror could also find that the evidence did not prove deliberation beyond a reasonable doubt, but was sufficient to establish that Smith had the requisite mental state for second degree murder. For example, from the evidence that about a week prior to the murder, Smith showed Hoskins his pistol and told Hoskins "you better get my money," a reasonable juror could infer that Smith coolly reflected on the killing a week in advance. On the other, a rational fact finder could infer from this evidence that Smith was merely trying to frighten Hoskins into paying him for the lawnmower. Likewise, a reasonable juror could infer from the evidence that Smith took Hoskins to his cousin's house in an effort to borrow the money to pay Smith, and the evidence that Smith told Hoskins that he would have to work off the debt by burglarizing a house, as well as the subsequent carrying out of the burglary, that Smith was satisfied to get repaid for the lawnmower. This evidence did not support an inference of deliberation, nor did the evidence that Smith, Glavin, Sosa and Hoskins continued to ride around and drink beer after the robbery.

And finally, the events at the time of the killing can yield different inferences on the issue of deliberation. For instance, the evidence was that Glavin wanted to urinate. Therefore, Smith stopped the car and it was initially beneath a streetlight. Smith then backed the car out of the light. The fact that Smith moved the car out of the light does not create an inference of deliberation because Hoskins had not yet decided to get out of the car at that time. Moreover, even if a reasonable juror could interpret the act of backing out of the light as evidence of deliberation, the fact finder could just as rationally infer that if men were going to urinate outside at night, they would not want to do so under a street light. As in *Santillan*, although there were two gunshot wounds inflicted upon Hoskins, none of the other evidence of deliberation approaches that in *Mease* so as to compel the conclusion that no reasonable person could find that Smith acted without deliberation.

As a result, the trial court erred in failing to give Smith's tendered instruction on second degree murder. Therefore, the judgements of conviction must be reversed and the cause remanded for a new trial. While it is unnecessary to discuss the other points raised by Smith on this appeal, one issue is likely to recur in the second trial and therefore, for the sake of judicial economy, we will address Smith's contention that the trial court erred in denying his motion to suppress the evidence obtained from the safe at 1901 Lawn. Smith claims that the warrantless search of the safe violated his right under the Fourth Amendment to be free from illegal searches and seizures because Frost had no authority to consent to a search of either the house or the safe.

■ A search conducted without a warrant but with proper consent, voluntarily given, is valid under the Fourth Amendment. *State v. Blair*, 638 S.W.2d 739, 750 (Mo. banc 1982) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973)). In order to establish consent, the state must prove by a preponderance of the evidence that the person giving the consent did so voluntarily and had the authority to do so. *State v. White*, 755 S.W.2d 363, 366 (Mo.App. E.D.1988). A third party with joint access or control of the premises sought to be searched has authority to consent to a search, and that consent is valid against any absent persons with whom that authority is shared. *State v. Bunch*, 787 S.W.2d 859, 861 (Mo.App. E.D.1990). A warrantless search based on consent is valid if the police officers involved reasonably believed that the person granting consent had the authority to do so, even if that belief later turns out to be erroneous. *Illinois v. Rodriguez*, 497 U.S. 177, 186, 110 S.Ct. 2793, 2800, 111 L.Ed.2d 148 (1990).

■ Smith initially challenges Frost's authority to consent to the search of 1901 Lawn. Smith claims that, because Frost had obtained an order of protection against Smith at some point prior to the search, the police officers should have known she did not have authority over 1901 Lawn. Nothing in the record indicates that the order obtained by Frost would have limited her control of or access to 1901 Lawn. Furthermore, when the officers located Frost, she was living with Smith in his father's home. The officers had no reason to believe they needed to check the courthouse records for an order of protection.

In further support of his contention, Smith notes that Frosts' name was not on the deed to 1901 Lawn, that she had not lived there in over a month, and that she had to kick in the door to allow the police entry. "[T]he authority which justifies the third party consent does not rest upon the law of property but rests instead on mutual use of the property by persons generally having joint access or control for most purposes." *State v. Nevels,* 712 S.W.2d 688, 691 (Mo.App. W.D.1986) (citing *United States v. Matlock,* 415 U.S. 164, 171, n. 7, 94 S.Ct. 988, 993, n. 7, 39 L.Ed.2d 242 (1974)). Frost was Smith's girlfriend and the mother of his child. When the detectives located Frost at Smith's father's house, she indicated that she owned 1901 Lawn jointly with Smith and that she had helped purchase the home with money from her parents. Frost and Smith had been living together at 1901 Lawn until about a month prior to the search, when plumbing problems caused Smith and Frost to move in with Smith's father at 411 Indiana. Frost indicated that she intended to move back to 1901 Lawn as soon as the plumbing repairs were completed. Frost also told the detectives that she had been to 1901 Lawn the previous day, and because the door was broken, she had used nail to secure it. When Frost approached the house with the detectives, she was aware of how the door was secured and how to open it. Nothing in the record indicates that the detectives should have had any reason to doubt Frost. This evidence is sufficient to support a finding either that Frost had actual control over and access to 1901 Lawn or, at the very least, that the detectives reasonably believed that

she had the authority to consent to the search of the house.

While we find the search of the house at 1901 Lawn did not violate Smith's Constitutional rights, the issue of the search of the safe itself is far more problematic. Smith argues that, even if Frost had the authority to consent to a search of the house, her authority did not extend to the search of the safe. The record indicates that, while searching one of the bedrooms, the detectives found Smith's driver's license, some personal papers, and a locked safe. The detectives carried the safe out to the front porch where they forced it open using a hammer, a crowbar, and a heavy-duty screwdriver. Inside the safe, the detectives found seven live .45 rounds. Four were marked "GFL 45 ACP," and three were marked "Federal 45 auto."

The State argues that, because Smith failed to present evidence that Frost did not have access to the safe, her authority to consent to a search of it should be assumed. The State contends that the fact that the detectives chose to pry open the safe does not indicate Frost's lack of access because the detectives may have decided not to bother asking her for the combination or she may not have still been present in the house. The State concludes by asserting that "the mere fact that the police chose to pry open the safe, rather than ask Ms. Frost for the combination, proves nothing."

■ We observe first that the State's assertions are fatuous at best. Secondly, in making these arguments, the State disregards the fact that the it bore the burden of proving that Frost had the authority to consent to the search of the safe. *State v. Pinegar,* 583 S.W.2d 217, 219 (Mo.App. W.D. 1979); *Bunch,* 787 S.W.2d at 861. At a hearing on a motion to suppress, the State bears both the burden of producing and presenting evidence, and the risk of non-persuasion to show by a preponderance of the evidence that the motion should be overruled. *State v. Franklin,* 841 S.W.2d 639, 644 (Mo. banc 1992). In this regard, the State produced no evidence that Frost had any interest in the safe or its contents so as to legally enable her to consent to the search. *See Pinegar,* 583 S.W.2d at 220 (holding that, even though mother could consent to search

of bedroom sometimes used by son, she had no authority to consent to search of son's private footlocker found in that room); *State v. Oberg*, 602 S.W.2d 948, 953 (Mo.App. W.D. 1980) (holding an informant could not consent to search of sealed containers found on premises owned and controlled by the informant where informant had no proprietary interest in or control over the sealed containers or their contents). Furthermore, there is no evidence that Frost even purported to consent to a search of the safe. There is nothing in the record to suggest that her consent to a search of the house in general included her consent to the detectives use of a hammer, crowbar and heavy duty screwdriver to open a locked safe found therein. The State failed to sustain its dual burden on this issue at the hearing on the motion to suppress and, therefore, the trial court clearly erred in finding Frost had the authority to consent to a search of the safe and in denying Smith's motion to suppress the evidence found therein.

Consequently, upon remand, the trial court shall sustain Smith's motion to suppress as to the evidence found in the safe unless additional evidence is presented which persuades the trial court that the state has met its dual burden on the issue. In this regard, we note that the only evidence found in the safe were seven live .45 caliber rounds of ammunition. Four were marked "GFL 45 ACP," and three were marked "Federal 45 auto." The probative value of the live ammunition found in Smith's safe was minimal. The most that evidence could have established for the jury was that Smith owned or had access to the same type of ammunition used in the killing, although, from the testimony at trial, it is questionable whether those rounds were even the same type used to kill Hoskins. In any event, they should have been excluded because of the failure of the state's evidence at the motion to suppress.

For the reasons stated, the judgments of conviction are reversed and the cause remanded for a new trial.

All concur.