STATE of Missouri, Respondent,

v.

Steven B. BEAL, Appellant.

No. WD 52724.

Missouri Court of Appeals, Western District.

Nov. 10, 1997.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 23, 1997.

Application for Transfer Sustained Jan. 27, 1998.

Case Retransferred May 26, 1998.

Court of Appeals Opinion Readopted June 2, 1998.

Susan L. Hogan, Appellate Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

Before ULRICH, C.J., P.J., and SMART and ELLIS, JJ.

ULRICH, Chief Judge, Presiding Judge.

Steven Beal appeals his convictions following jury trial for one count of first degree murder, section 565.020,[1] one count of first degree assault, section 565.050, and two counts of armed criminal action, section 571.015, and concurrent sentences of life imprisonment without parole, life imprisonment, and two twenty-year terms of imprisonment, respectively. He claims that the trial court erred in (1) refusing to submit instructions on the lesser included offenses of second degree murder and involuntary manslaughter, and (2) admitting his videotaped statement to police that included a reference to his previous gang involvement. The judgment of convictions is affirmed.

## FACTS

On the evening of February 1, 1995, Appellant Steven Beal, Terelle Berry, and David Jordan were at the home of Mr. Beal's girlfriend, Antoinette Clark. Sometime between 10:00 and 11:00 p.m., Mr. Beal borrowed Ms. Clark's white, 1995 four-door Geo Metro, with Kansas license plate number JRO–002, to take Mr. Berry and Mr. Jordan home.

At approximately 11:50 p.m., Billy James, a 53–year–old bearded black man, was walking on the sidewalk along the 2600 block of Indiana in Kansas City when a white car pulled over to the curb near him. An occupant of the car spoke to him, but he could not understand what they said so he approached the car to hear the person better. When he got to the car, he was shot in the face. The car sped away, and Mr. James was able to walk back to his house on the same street and called the police. The gunshot broke Mr. James's jaw and knocked out his teeth. He spent about two weeks in the hospital after the shooting.

Approximately 40 minutes later at 12:30 a.m. on February 2, Charles Kirk was sitting in his car in a parking lot across the street from The Levee, a bar located on 43rd Street in Kansas City. Mr. Kirk, a security guard for the bar, was watching the premises when he saw Stephen Brown, an elderly black man, walking along the street. Mr. Kirk had seen Mr. Brown in the area before and knew him to be a jovial person. That night, however, Mr. Kirk noticed that he seemed scared and kept looking back over his shoulder.

As Mr. Brown approached some railroad tracks that led into a park, Mr. Kirk observed a white, four-door car being driven into the parking lot near the tracks. A man exited the car and ran, with his hand under his shirt, down a hill toward Mr. Brown. Suddenly, Mr. Kirk heard three gunshots and saw the man run back to the car. As the car sped away, Mr. Kirk noted that the car had Kansas license plates on which appeared a "J" and "002." He then rushed down the hill, found Mr. Brown lying face down in the gravel, and ran back to the bar to call for emergency assistance. By the time help arrived, Mr. Brown had died of two intermediate range gunshot wounds to his back.

At about the same time, Mark Smith, a taxi driver, was getting gas at a nearby convenience store when he heard three gunshots coming from the direction of The Levee. Mr. Smith got into his cab and started to leave the store's parking lot when he observed a small, white car occupied by three people. The white car slowly exited the driveway across the street from Mr. Smith and turned southbound on Main Street. Mr. Smith was suspicious, so he followed the car. He called the car's license plate number, Kansas JRO–002, into his dispatcher. Later that night, Mr. Smith was called to the crime scene and reported the license plate number to the police.

At 3:45 a.m., a police officer stopped the white Geo Metro and arrested the driver and two passengers. The car was secured and towed. At 4:00 a.m., Ms. Clark consented to a search of her car. The search yielded a box of live ammunition and two weapons, a Taurus 9mm semiautomatic pistol and a Grindle P12 .38 semiautomatic pistol. Ballistics testing revealed that the 9mm had fired three shell casings that were found on the railroad tracks near Mr. Brown's body and

---

1. All statutory references are to RSMo 1994 unless otherwise indicated.

two bullets that were recovered from his body. A shell casing that was found at the scene of the Billy James shooting and a bullet recovered from his body was determined to have been fired by the Grindle P12 .38.

Mr. Beal was interviewed after his arrest. He initially denied any involvement in the shootings; however, he soon admitted shooting Mr. Brown. Mr. Beal was charged with first degree murder for the death of Mr. Brown, first degree assault for shooting Mr. James, and two counts of armed criminal action.

At trial, he testified in his own defense explaining that he carried his 9mm handgun for protection because he had been robbed at gunpoint twice and had been shot at several times. He testified that on the night of the shootings, he was driving the white car when Mr. Berry told him to pull over to the curb. When a man approached the car, Mr. Berry shot him without warning. Mr. Beal asserted that he panicked and drove away. Eventually, he got lost and pulled into a parking lot across from The Levee. He further explained that he got out of the car and ran down to the railroad tracks to urinate when a man approached him. He told the man to leave him alone and showed him his weapon. Mr. Beal stated that the man continued to walk toward him, he panicked again and fired three shots at the man as the man was facing him.

Mr. Beal was convicted of the four counts charged and sentenced to concurrent terms of life imprisonment without parole for murder, life imprisonment for assault, and twenty years imprisonment for each armed criminal action count. This appeal followed.

## I. LESSER INCLUDED OFFENSE INSTRUCTIONS

In his first point on appeal, Mr. Beal claims that the trial court erred in refusing to submit his offered instructions for the lesser included offenses of second degree murder and involuntary manslaughter. He asserts that the evidence provided a basis for both an acquittal of first degree murder and a conviction of either second degree murder or involuntary manslaughter. Specifically,

Mr. Beal argues that the jury could have found from the evidence that he did not deliberate in causing the death of Stephen Brown.

A court is not obligated to instruct the jury on a lesser included offense unless the evidence provides a basis to acquit the defendant of the charged offense and to convict him of the lesser included offense. § 556.046.2. Second degree murder and involuntary manslaughter are lesser included offenses of first degree murder. § 565.025.2. A person commits first degree murder if he knowingly causes the death of another person after deliberation upon the matter. § 565.020.1. A person commits second degree murder if he knowingly causes the death of another person or, with the purpose of causing serious physical injury, causes the death of another person. § 565.021.1. A person commits the crime of involuntary manslaughter if he recklessly causes the death of another person. § 565.024.1(1).

 The element of deliberation distinguishes first degree murder from second degree murder. *State v. Santillan*, 948 S.W.2d 574, 576 (Mo. banc 1997). Deliberation is defined as "cool reflection for any length of time no matter how brief." § 565.022(3). Deliberation is a mental state that may be proved by indirect evidence and inferences reasonably drawn from the circumstances surrounding the crime and, therefore, is a question of fact for the jury. *Santillan*, 948 S.W.2d at 576. Thus, a defendant is entitled to a second degree murder instruction in most homicide cases. *Id.* A second degree murder instruction need not be submitted, however, if "all of the evidence supports a finding of deliberation and no reasonable juror could conclude otherwise." *Id.*

The evidence in this case did not provide a basis from which a reasonable juror could have concluded that Mr. Beal acted without deliberation in causing the death of Stephen Brown. Evidence presented at trial showed that Mr. Brown appeared frightened to witness Charles Kirk, who observed Mr. Brown descend a hill near the Levee. Mr. Beal arrived in a white vehicle, exited the car, and ran down the hill behind Mr. Brown. Mr.

Beal shot Mr. Brown three times in the back shortly after descending the hill. Mr. Beal then ran to the waiting white car, got in the vehicle, and sped away. Although Mr. Beal testified that he panicked and shot Mr. Brown when Mr. Brown approached him, Mr. Beal's version of the shooting was contrary to the undisputed physical evidence that Mr. Brown was shot in the back. Furthermore, Mr. Beal admitted that Mr. Brown did not have a weapon and did not threaten or attack him. Mr. Beal testified that Mr. Brown did not even say anything to him.

■ The evidence did not provide a basis to acquit Mr. Beal of first degree murder and to convict him of second degree murder or involuntary manslaughter. No reasonable juror could have believed Mr. Beal's testimony that he shot Mr. Beal without deliberation. The evidence supported only a finding of deliberation. The trial court, therefore, did not err in refusing to instruct the jury on second degree murder and involuntary manslaughter. Point one is denied.

## II. EVIDENCE OF UNCHARGED CRIMES

In his second point on appeal, Mr. Beal claims that the trial court erred in admitting his videotaped statement to police that included a reference to his previous gang involvement. He argues that the reference to gang activity constituted evidence of other uncharged crimes or bad acts and, thus, was inadmissible.

■ A trial court is vested with broad discretion in admitting or excluding evidence. *State v. Henderson*, 826 S.W.2d 371, 374 (Mo.App.1992). Absent a clear abuse of discretion, a trial court's ruling on the admission or exclusion of evidence will be upheld on appeal. *Id.*

Mr. Beal argues that the following portion of his videotaped statement to police admitted at trial constituted evidence of other uncharged crimes:

DETECTIVE: Any of you guys banging or anything?

MR. BEAL: No, sir. I got a-I got out of all that stuff when I was 16. I used to be

in all that stuff when I was 16. I ain't messed with that stuff since then.

Q: What were you doing when you were 16?

A: [Unintelligible] ... little Crip gang over there.

Q: How about the other guys; how about David and [inaudible].

A: Naw, they wasn't there banging. Terelle always been a little-Naw, they wasn't never into that.

■ Evidence of uncharged crimes or bad acts is generally inadmissible to show the bad character or the propensity of a defendant to commit the charged crime. *State v. Bernard*, 849 S.W.2d 10, 13 (Mo. banc 1993). Such evidence is admissible, however, if it has a legitimate tendency to establish directly the defendant's guilt of the charged crime and if its probative value outweighs is prejudicial effect. *Id.* Evidence of other uncharged crimes or bad acts is deemed to prove the crime charged when it tends to establish motive, intent, the absence of mistake or accident, a common scheme or plan, or the identity of the person charged. *Id.*

■ Evidence of a defendant's affiliation with a gang is not necessarily evidence of uncharged crimes or bad acts. It is normally, however, improper character evidence. *See State v. Fox*, 916 S.W.2d 356, 360 (Mo. App.1996)(where state's solicitation of testimony that murder defendant was a member of a biker gang was improper character evidence). To most jurors, gang involvement connotes unlawful or antisocial activity. Thus, to the extent that evidence of gang membership is introduced to prove the bad character or the propensity of the accused to commit the charged crime, it is irrelevant. Such evidence, however, may be probative and admissible if it tends to prove a motive for the crime, the possible bias of defense witnesses who are shown to be members of the defendant's gang, a common design or purpose in crimes committed by a group, or the identification of the defendant. *See* John E. Theuman, Annotation, *Admissibility of Evidence of Accused's Membership in Gang*, 39 A.L.R.4th 775 (1985). Likewise, such evi-

dence of bad character may be admissible where a defendant first places his character in issue. *State v. Guidorzi*, 895 S.W.2d 225, 230 (Mo.App.1995).

█ No evidence was presented that the charged crimes were gang-related, and Mr. Beal did not present character evidence. The evidence of Mr. Beal's prior gang membership was not introduced to prove Mr. Beal's guilt of the charged crimes by establishing motive, common design, or identity. That portion of Mr. Beal's statement to the police about his prior involvement with a gang was, therefore, irrelevant and improperly admitted into evidence.

█ A trial court's admission of irrelevant evidence of other crimes or bad character will not be reversed on appeal, however, absent a showing of prejudice. *Henderson*, 826 S.W.2d at 375. Where the presumption of prejudice from the erroneous admission of evidence is overcome by the strength of the overwhelming evidence of guilt, reversal is not mandated. *State v. Miller*, 821 S.W.2d 553, 556 (Mo.App.1991). The evidence of Mr. Beal's prior gang association amounted to only a very small portion of his police statement and did not include any statement of activity while a gang member, and the state did not attempt to convict Mr. Beal through his prior association with a gang. The evidence of Mr. Beal's guilt, including his admissions, was overwhelming, and there is no reasonable doubt that he would have been convicted of the crimes without the erroneously admitted evidence. Point two is denied.

The judgment of convictions is affirmed.

SMART, J., concurs.

ELLIS, J., concurs in separate concurring opinion.

ELLIS, Judge, concurring.

*State v. Santillan*, 948 S.W.2d 574 (Mo. banc 1997), teaches that it is a rare murder case where a second degree murder instruction will not be required if requested. Our recent holding in *State v. Smith*, 966 S.W.2d 1 (Mo.App. W.D. 1997), instructs similarly. While I concur in the principal opinion, I write separately to articulate why I deem the decision herein consistent with the precepts of *Santillan* and *Smith*.

In the vast majority of homicide cases, the defendant is entitled to a second degree murder instruction if requested. *Santillan*, 948 S.W.2d at 576; *State v. Mease*, 842 S.W.2d 98, 112 (Mo. banc 1992); *Smith*, 966 S.W.2d at 4–5. "[I]f there is any doubt upon the evidence, the trial court should resolve any doubts in favor of instructing on the lower degree of the crime, leaving it to the jury to decide which of two or more grades of an offense, if any, the defendant is guilty." *Santillan*, 948 S.W.2d at 577. It is only in the relatively small number of cases where there is no contradictory or confusing evidence regarding deliberation that the second degree murder instruction need not be given if requested. *State v. Mease*, 842 S.W.2d at 112; *Smith*, 966 S.W.2d at 6. This means, "in effect, only in those instances when a reasonable juror could not draw different inferences from the facts presented on the issue of whether the defendant deliberated." *Smith*, 966 S.W.2d at 6.

I am persuaded the instant appeal is such a case. Charles Kirk, the security guard, knew the victim, Stephen Brown, and knew him to be a jovial person. Just prior to Mr. Brown's death, Mr. Kirk observed that Mr. Brown seemed scared and was looking over his shoulder. Immediately after making that observation, Mr. Kirk saw the white car drive into the parking lot near where Mr. Brown was walking, and saw a man exit the car and run, with his hand under his shirt, down the hill toward Mr. Brown. Three shots were fired and the man ran back to the car, got in and it sped away. From this evidence, the only reasonable inference that can be drawn is that the men in the car were stalking Mr. Brown waiting for the right location to kill him. This inference is buttressed by the short length of time between the arrival of the car in the parking lot and the man's exit from the car, to his quick return to the car with the intervening gunshots.

The fact that three gunshots were fired, and Mr. Brown died from two gunshot wounds to his back, fired from intermediate range, likewise can only support an inference of deliberation. The multiple shots, the fact that Mr. Brown was shot in the back, and from some distance (as opposed to close range), negate any motivation which might lead to an inference of lack of deliberation. There was no robbery nor any attempt, Mr. Brown was unarmed and Mr. Beal admitted Mr. Brown did not attack him. Moreover, as observed in the principal opinion, Mr. Beal's testimony cannot form the basis for the giving of the second degree murder instruction because the physical evidence that Mr. Brown was shot in the back was such that no reasonable juror could believe his version that he panicked and shot three times at Mr. Brown as Mr. Brown was facing him.

Thus, in the instant case, I can find no contradictory or confusing evidence on the issue of deliberation, nor can I ascertain any reasonable inference from the evidence which might enable a rational fact finder to conclude that Mr. Beal did not act upon cool reflection. Unlike *Santillan* and *Smith,* there are no facts regarding conduct or a relationship between the defendant and the victim prior to the shooting which could give rise to conflicting inferences. Therefore, in my view, this is one of those unique cases like *State v. Mease, supra,* where all of the evidence supports a finding of deliberation and no reasonable juror could conclude otherwise.

SMART, J., concurs.