STATE of Missouri, Respondent,

v.

Zachary A. SMITH, Appellant.

No. WD 58814.

Missouri Court of Appeals, Western District.

Sept. 24, 2002.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 29, 2002.

Application for Transfer Denied Dec. 24, 2002.

Andrew A. Schroeder, Assistant State Appellate Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before HOWARD, P.J., and EDWIN H. SMITH and NEWTON, JJ.

VICTOR C. HOWARD, Presiding Judge.

Zachary A. Smith appeals from his convictions of murder in the first degree, § 565.020,[1] and armed criminal action, § 571.015. Smith raises three points on appeal. First, he contends the trial court erred in 1) permitting the State to ask its hostile witness whether his memory loss was the result of Smith's brother nodding at him in the hallway, without first requiring the State to lay a foundation for such questioning; and 2) not giving the jury a limiting instruction directing it not to attribute any wrongdoing by Smith's brother to Smith. Second, Smith contends the trial court erred in admitting several exhibits consisting of items found in a safe in his house because they were obtained as a result of a warrantless, non-consensual search. Third, Smith claims the trial court erred in allowing the jury to view a video-taped statement of one of the witnesses

___

1. All statutory references are to RSMo 2000.

during its deliberations because the statement was testimonial in nature.

We affirm.

### Facts

On June 23, 1995, at around 10:00 p.m., Zachary Smith left his father's home in Kansas City and started driving around in a borrowed, maroon Buick with Kevin Glavin and Jose Sosa. Smith was armed with a black .45–caliber handgun. The men stopped at a gas station to buy some cigarettes. While they were there, Derek Hoskins rode up on his bicycle. Several weeks earlier, Hoskins had confessed to stealing Smith's lawn mower. Hoskins had promised to pay Smith back for the lawn mower, but never did. About a week earlier, Smith had shown Hoskins a pistol he was carrying and warned him, "You better get my money."

When Hoskins rode up to the gas station on his bicycle, Smith asked if he had the money he owed him. Hoskins said he did not have the money he owed him, but the money was at his house and he would go and get it. When Hoskins suggested that they follow him to his cousin Tyrone Morgan's house, Smith insisted they put the bike in the trunk and that Hoskins ride with them in the car. During this incident, a witness heard what sounded like two guns being cocked. After placing Hoskins' bicycle in the trunk of the car, they drove to Morgan's home, where Tyrone's younger brother told Hoskins that Tyrone was not home.

After Hoskins got back in the Buick, Smith told him that he could work off the debt by burglarizing a house. Hoskins agreed. Smith took Hoskins' bicycle from the trunk and put it in a field near Smith's house. Smith next drove the group to a house, where Hoskins and Glavin got out of the car. Hoskins knocked on the door, and when nobody answered, he kicked in the door and stole a television set and a stereo, both of which he placed in the trunk of the Buick. The men returned to Smith's house and dropped off the television and the stereo. Smith then informed Hoskins that he would have to commit another burglary to fully repay the debt.

Smith drove the group to the northeast part of the city, where they stopped to buy some beer. After driving around for about half an hour, Glavin told Smith he needed to urinate. They were in an area called Cliff Drive at the time. Smith stopped the car under a streetlight, but then backed the car out of the light, even though the street was deserted. When Hoskins asked if he could get out of the car to urinate, Glavin told him to remain in the vehicle because "something did not feel right." Hoskins told Glavin, "I got to go pee," and got out of the car anyway.

As Hoskins and Glavin stood by the curb urinating, Smith got out of the car and stood behind and in between the two. Glavin then heard a gunshot, looked up, and saw a bright flash. He saw Smith holding a pistol about one to two feet away from Hoskins. Hoskins went limp and fell to the ground. After Smith and Glavin got back in the car, Smith muttered something about "good measure" and fired another shot out the window at Hoskins.

About sunrise the next day, the three men went to the house of Sosa's girlfriend, Rose Marie Sanchez. Sanchez later told the police that Smith had arrived in a newer, four-door burgundy or red car and had a gun tucked into his waistband. Later that morning, Catherine Stone looked out her window and saw Smith standing next to the maroon car.

Smith then drove back to his father's house, where he and his girlfriend, Cynthia Frost, had been living for about a month.

Smith handed his gun to Frost and told her to put it up.

The following day, Smith took Glavin to his bedroom and showed him Hoskins' bicycle, which was now covered in black tape. Smith told Glavin that he was going to give the bicycle to a little kid. Smith later gave the bicycle to a boy who was visiting Smith's father's house.

Smith sought Glavin's help in disposing of the murder weapon. He wanted Glavin to accompany him while he drove across the Chouteau Bridge and threw it in the river. Glavin asked Smith whether Sosa was in on the plan to kill Hoskins. Smith told him that Sosa did not know anything about it, and that he (Smith) was the "master mind." Smith told Glavin that the last words Hoskins said were "I got to go pee" and that Hoskins "had it coming for stealing from him."

Between 3:00 and 4:00 a.m. on June 24, 1995, two security officers patrolling the Cliff Drive area heard gunshots. Later, a man reported that he had seen someone lying in the street who appeared to be seriously injured. The security officers went to the scene, where they found Hoskins' body. When Detective Ron Payne, a crime scene technician, arrived several hours later, he found Hoskins' body lying in the street with his head facing south and the snap of his shorts unfastened. On the ground, Payne found two spent bullets and two shell casings.

An autopsy revealed that Hoskins' death was caused by a gunshot wound to the right temple region. The bullet entered Hoskins' head from the front and penetrated his brain at a 45–degree angle. The bullet exited from the left side of his upper neck. Hoskins was also wounded by a cluster of five superficial, slit-like cuts in the upper left chest and an abrasion consistent with a ricochet shot.

Police confiscated the bicycle that had belonged to Hoskins.

A police officer spoke with Lori Stone, who lived next door to Smith's father's house. She told the officer that two weeks before Hoskins' death, she had seen Smith fire a black .45–caliber handgun into the air twice. Catherine Stone, Lori's sister, later told officers that she had also seen Smith shoot his gun in the air near his father's house.

Police detectives Roger Lewis and Mark Heimer spoke with Cynthia Frost. Frost told the detectives that she co-owned a house with Smith. On June 27, 1995, detectives asked Frost to sign a consent to search form for Smith's house, and she complied. Frost accompanied the detectives to the house. In one of the bedrooms, the detectives found Smith's driver's license and some personal papers. They also found a locked safe in the bedroom. Frost told the police that the safe was "her and Zach's" and authorized them to open it. One of the detectives quoted Frost as stating that "it was her safe and that we could open it."

The detectives carried the safe out to the front porch, where they forced it open using a hammer, a crowbar, and a heavy-duty screwdriver. Inside the safe, the detectives found a purple Crown Royal bag containing several live .45 rounds and an empty box of .45–caliber ammunition. The safe also contained a Missouri inmate card in the name of Jose Sosa and a Missouri identification card in the name of Zachary Smith.

On June 29, 1995, the police found Smith hiding underneath a bed at 2000 Oakley and arrested him. After receiving and waiving his Miranda rights, Smith told the police that on the evening of June 24, 1995, he had gone bowling with several friends. He said that he and his friends had then gone to his father's house, where they

remained until 11:00 a.m. the next morning. Smith denied owning a gun, claimed not to know Glavin, and stated that he had not seen Hoskins for a month. He also told police that he did not have Hoskins' bicycle, he had not been in a maroon car, and he had not been to Cliff Drive in at least three to four months.

On June 30, 1995, the police examined the Buick for fingerprints. A print taken from the interior of the driver's side door matched Smith's left middle finger. In addition, William Newhouse, a firearms and tool mark examiner with the Kansas City Regional Crime Laboratory, examined the shell casings and bullets collected during the investigation of Hoskins' death. After examining the two shell casings found at the crime scene, the two casings found at Smith's house, and the two casings found at Smith's father's house, Newhouse determined that all six casings had been fired from the same .45–caliber pistol. Newhouse also determined that the bullets recovered from the crime scene were fired from the same pistol. One of the bullets was "flattened," which was consistent with a ricochet off the pavement. The recovered bullet fragments also indicated a ricochet. Smith could not explain why shell casings from the crime scene matched casings from outside his house.

Following a jury trial, Smith was found guilty of murder in the first degree and armed criminal action. He was sentenced to concurrent terms of life imprisonment without the possibility of probation or parole and 99 years' imprisonment, respectively. This appeal follows.

### Point I

Smith's first point on appeal is that the trial court erred in permitting the State, over defense counsel's objection, to ask its "hostile" witness, Kevin Glavin, whether his memory loss was the result of Smith's brother nodding at him in the hallway, without first requiring the State, per defense counsel's request, to lay a foundation for such questioning outside the presence of the jury. Smith further contends the trial court erred in overruling defense counsel's request for a limiting instruction directing the jury not to attribute any wrongdoing by Smith's brother to Smith.

At Smith's prior trial, Glavin had been a witness for the State. However, at Smith's second trial, Glavin claimed that he was not mentally capable of testifying. He said he had just gotten out of the hospital a month earlier and that he was under a couple of different medications. He told the judge that he had been diagnosed as bipolar, a condition that made it hard for him to concentrate or make accurate decisions. Glavin said, "I have thoughts in my mind that are contradictory to what I believe." He also said that his medication made him drowsy and made his mouth dry.

Following Glavin's statements, the prosecutor advised the court that Glavin was "fine." He noted that Glavin worked two jobs and had shown up for trial every day. He added that he had spoken with Glavin over the telephone prior to trial, and then noted that "[h]e even did a little signaling out there in the hall."

Defense counsel suggested that Glavin might need an attorney, but the judge rejected this suggestion after confirming that Glavin was not going to be charged with any offense connected with the incident.

The judge then instructed Glavin to testify, stating that Glavin appeared to be "quite lucid and quite aware of what is going on around [him]" and that he seemed "very verbally skilled."

Glavin responded, "Sir, I don't think I remember the facts of this case. It has been a long time."

On direct examination, Glavin claimed that he could not remember the circumstances surrounding the murder. Glavin then testified as follows:

Q. Okay. Do you remember what just happened out in the hall a little bit ago, maybe 10, 15 minutes ago?

A. What are you referring to?

Q. You know what I am referring to. I was out there, went into the hall and you were there walking this way, and the defendant's brother Tory Smith walked by you. Remember what happened out there?

A. No, sir.

Q. You don't remember Tory nodding to you? You don't remember—

A. No.

\* \* \* \* \*

Counsel then approached the bench and defense counsel objected to the reference to Smith's brother on the basis that "he's painting with such a broad brush here it's going to appear that his brother has directed some influence on him which I think is prejudicial to the defendant." Defense counsel also argued that the prosecutor was attempting to impeach Smith's character "through the family." He argued that a foundation needed to be laid outside the hearing of the jury that Smith's brother was "doing anything wrong."

The court then stated for the record that the court and counsel had previously discussed in chambers the fact that Smith's brother was communicating in the hallway with Glavin and "they exchanged nods and used motions." Defense counsel responded that the prosecutor was close to interjecting himself as a witness in the case, if he had not already done so.

The court asked the prosecutor the purpose of bringing in the hallway incident, and the prosecutor responded that the purpose was "[t]o show that he's just fine and that this lack of memory is just totally on purpose which is why he is going to draw out this entire thing. . . . It's to show why he is doing what he is doing. It goes to the State's case."

Defense counsel argued that "there is a neutral reason" and that "he was wiping his mouth and made some reference to a cold." Defense counsel further argued that the prosecutor was "opening the door to wild speculation" that could be damaging to Smith's character by implying that Smith was "somehow involved." Defense counsel requested a limiting instruction informing the jury that the purpose of the line of questioning was not to impeach Smith's character or to indicate that Smith "had anything to do with that."

The court then stated, "I'm going to allow the question. Let's see what he has to say first. Then after he responds to this and he finishes with this line of inquiring then approach the bench and we'll—I'll be happy to."

Glavin then resumed testifying, and the following exchange occurred:

Q. A little bit ago when we were out there in the hallway, 10 or 15 minutes ago, the brother of the defendant walked by, he nodded, he went like this (indicating) and the defendant nodded again. Didn't that happen?

A. No, sir. I have only heard Zach's brother by name. I don't know Zach's brother.

\* \* \* \* \*

Defense counsel objected on the basis that Glavin's answer was nonresponsive, and the court sustained the objection.

The prosecutor then moved on to a different line of questioning.

■ Smith first argues the trial court erred in allowing the line of questioning at issue without first requiring the State, per defense counsel's request, to lay a foundation for such questioning outside the presence of the jury. We agree with the State that this argument was not properly preserved. Three questions were asked and answered concerning the hallway incident before defense counsel objected. "An objection which is made after the question has been asked and answered is untimely, and, in the absence of a motion to strike the answer, the ruling of the trial court on the objection is not preserved for appellate review." *State v. Malone*, 951 S.W.2d 725, 729 (Mo.App. W.D.1997). "An exception to the above principle occurs when a party is not given the opportunity to voice an objection because of a quick response by the witness...." *State v. Decker*, 591 S.W.2d 7, 11 (Mo.App. E.D.1979). However, even when this is the case, the party must object at the earliest opportunity and move to strike the answer in order to preserve the trial court's ruling for appeal. *Id.* Smith did not contend at trial and does not now contend that that exception applies in this case, nor did he move at trial to strike Glavin's reply. Therefore, Smith's claim of error is not preserved.

■ "Ordinarily, failure to preserve an issue at the trial court waives the issue, and it is not reviewable on appeal." *State v. Robinson*, 44 S.W.3d 870, 872 (Mo.App. W.D.2001). However, pursuant to Rule 30.20, plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom. *Id.* "The plain error rule should be used sparingly and does not justify a review of every alleged trial error that has not been properly pre-

served for appellate review." *Id.*, quoting *State v. Valentine*, 646 S.W.2d 729, 731 (Mo.1983). We perceive no plain error by the court on this issue.

■ Smith's second argument is that the trial court erred in overruling defense counsel's request for a limiting instruction directing the jury not to attribute any wrongdoing by Smith's brother to Smith. When a defendant fails to request a jury instruction, a challenge to the lack of such an instruction is not preserved. *Malone*, 951 S.W.2d at 729. Furthermore, when a defendant fails to raise the issue of instructional error in his motion for new trial, he waives his claim of error. *State v. Wright*, 30 S.W.3d 906, 911 (Mo.App. E.D. 2000).

We find that Smith did not preserve this claim of error because 1) he failed to request the limiting instruction, despite the court's remark that it would "be happy to" submit such an instruction after the prosecutor finished the line of questioning; and 2) he failed to assert in his motion for new trial that a limiting instruction should have been given.

As previously discussed, claims of error that are not preserved generally will be reviewed only for plain error. We find no plain error in the trial court's failure to sua sponte give the jury a limiting instruction concerning Glavin's testimony about the occurrence in the hallway. Point I is denied.

**Point II**

■ Smith's second point on appeal is that the trial court erred in overruling Smith's motion to suppress evidence and admitting into evidence, over defense counsel's renewed objections, State's Exhibits 1) 7B, E, F and G, photographs of the safe in Smith's house, including some of the contents thereof; 2) 11(A–H), live rounds

seized from the safe; 3) 37, an empty box of .45–caliber ammunition seized from the safe; and 4) 16B, Smith's State of Missouri photo I.D. card, which was also seized from the safe. Smith also contends the trial court erred in admitting into evidence all testimony relating to the foregoing exhibits, including testimony concerning Jose Sosa's inmate card, which was seized from the safe. Smith contends the evidence seized from the warrantless search of his safe should have been excluded as fruit of the poisonous tree because the State never established that Smith's girlfriend, Cynthia Frost, actually gave her oral or written consent to search the safe, and the police could not otherwise have reasonably believed that Frost had common authority over the safe where she did not know the combination of the safe, where the combination was kept, or the contents of the safe.

The first trial in this case resulted in a hung jury. Following the second trial, Smith was convicted on both counts. On appeal, this court determined that the trial court clearly erred in finding that Frost had the authority to consent to a search of the safe and in denying Smith's motion to suppress the evidence found therein. *State v. Smith*, 966 S.W.2d 1, 9 (Mo.App. W.D.1997). We reversed Smith's convictions and remanded with directions to sustain Smith's motion to suppress as to the evidence found in the safe unless additional evidence was presented which persuaded the trial court that the State had met its burden on the issue. *Id.*

On remand, defense counsel filed a renewed motion to suppress, in which he argued for the suppression of evidence seized from Smith's house. The motion contended that while the police were purportedly acting pursuant to a consent to search executed by Cynthia Frost, the officers knew or should have known that Frost was not a resident of that house and did not have the authority to give permission to search. The trial court overruled Smith's motion to suppress.

When the State sought to elicit testimony concerning the search of Smith's house, defense counsel objected, renewing the arguments he made in the motion to suppress evidence. The trial court overruled the objections and gave counsel a continuing objection on the topics covered in the motion to suppress. When the State sought to admit Exhibits 7(A–G), photographs of the inside of Smith's house, defense counsel again objected on the grounds stated in the motion to suppress. The trial court overruled the objection and admitted the exhibits. The court gave counsel a continuing objection with respect to anything that was recovered in the house. Defense counsel advanced the claim of error with respect to the testimony and exhibits at issue in Smith's motion for new trial.

In *State v. West*, 58 S.W.3d 563, 567–68 (Mo.App. W.D.2001), we stated the applicable standard of review to be as follows:

This court's review of a trial court's decision concerning a motion to suppress evidence "is limited to a determination of whether there is substantial evidence to support its decision." The decision of the trial court will be reversed only if it is clearly erroneous and this court is "left with a definite and firm belief a mistake has been made." This court will view all evidence and any reasonable inferences therefrom in the light most favorable to the ruling of the trial court. "In reviewing the trial court's ruling on [a motion to suppress], this [c]ourt considers the record made at the suppression hearing as well as the evidence introduced at trial." While deference is given to the trial court's determination of the credibility of witnesses, " '[t]he

ultimate issue of whether the Fourth Amendment was violated is a question of law which this court reviews de novo.'" "At a suppression hearing, the State bears both the burden of producing evidence and the risk of nonpersuasion to show by a preponderance of the evidence that the motion to suppress should be overruled."

(Citations omitted.)

 A search conducted without a warrant but with proper consent, voluntarily given, is valid under the Fourth Amendment. *State v. Blair*, 638 S.W.2d 739, 750 (Mo. banc 1982). In order to establish consent, the State must prove by a preponderance of the evidence that the person giving the consent did so voluntarily and had the authority to do so. *State v. White*, 755 S.W.2d 363, 366 (Mo.App. E.D. 1988). A third party with joint access or control of the premises sought to be searched has authority to consent to a search, and that consent is valid against any absent persons with whom that authority is shared. *State v. Bunch*, 787 S.W.2d 859, 861 (Mo.App. E.D.1990). A warrantless search based on consent is valid if the police officers involved reasonably believed that the person granting consent had the authority to do so, even if that belief later turns out to be erroneous. *Illinois v. Rodriguez*, 497 U.S. 177, 186, 110 S.Ct. 2793, 2800, 111 L.Ed.2d 148 (1990). Determination of consent must be judged against an objective standard; that is, would the facts available to the officer at the moment warrant a person of reasonable caution in the belief that the consenting party had authority over the premises. *Id.* at 188–89, 110 S.Ct. 2793; *State v. Lewis*, 17 S.W.3d 168, 170 (Mo.App. E.D. 2000).

During the suppression hearing, Officer Lewis testified as follows:

Q. Did Ms. Frost tell you anything about that safe?

A. Yes, she did. Upon finding the safe and finding that it was locked, I responded back outside where she was with Detective Heimer and inquired of her about the safe and if it was hers. She told me that it was their's [sic], meaning her and Zach's. I asked her about the combination. She did not recall the combination. And I asked her if I could open the safe or if I could gain access inside the safe.

\* \* \* \* \*

Later in his examination, Officer Lewis testified as follows:

Q. Well, what evidence other than [Frost's] bald statement that she was the co-owner of the safe did you have to lead you to believe she owned that safe?

A. Well, as I testified earlier, the fact that it was in a residence that she was—or in a house that she was a resident of and had signed a consent to search for.

Q. And you considered the consent to search gave you the right to search everything inside of that house including locked safes?

A. Given the additional information from her verbally that it was her safe and that we could open it, yes.

\* \* \* \* \*

We find that Officer Lewis's testimony provided sufficient evidence that Frost gave her consent to search the safe. Furthermore, we find that the officers reasonably believed that Frost had the authority to consent to a search of the safe. While there was evidence that Frost did not know the combination of the safe, where the combination was kept, or the contents of the safe, there was also evidence that Frost co-owned the house, she let the offi-

cers into the house, and she said she co-owned the safe. These facts would warrant a person of reasonable caution to believe that Frost had authority over the safe. Point II is denied.

### Point III

 Smith's third point on appeal is that the trial court plainly erred and abused its discretion in allowing the jury to view State's Exhibit "3[]0," Kevin Glavin's videotaped statement, during its deliberations, despite the fact that the statement was testimonial in nature. Smith contends the State impermissibly obtained an unfair advantage when it was allowed to completely duplicate and enhance the most damaging evidence against him at the most critical stage of the trial.

"The decision to send an exhibit to the jury room during deliberations lies within the sound discretion of the trial court." *State v. Barnett*, 980 S.W.2d 297, 308 (Mo. banc 1998). A trial court abuses its discretion only when its decision to exclude an exhibit from the jury room is clearly against reason and resulted in an injustice to the defendant. *Id.* "An objecting party has the burden of showing the prejudicial result of sending exhibits to the jury." *State v. Sullivan*, 925 S.W.2d 483, 485 (Mo.App. E.D.1996).

During its deliberations, the jury asked to view Glavin's videotaped statement a second time. The trial court subsequently brought the jury back into the courtroom and played Glavin's videotaped statement. Defense counsel did not object to Glavin's videotaped statement being replayed for the jury. Accordingly, Smith concedes that this claim of error is not preserved on appeal, and he requests plain error review of this point.

The standard for plain error review is set forth in Point I. We find no plain error by the court in allowing the jury to view Glavin's videotaped statement during deliberations. "Trial judges are not expected to assist counsel in trying cases, and should act sua sponte only in exceptional circumstances." *State v. Buckner*, 929 S.W.2d 795, 799–800 (Mo. App. W.D.1996). "A trial court will not be faulted for failing to take corrective action, when that action is not requested." *State v. Francis*, 60 S.W.3d 662, 671 (Mo.App. W.D.2001). Point III is denied.

The judgment of the trial court is affirmed.

EDWIN H. SMITH and NEWTON, JJ., concur.