STATE of Missouri, Respondent,

v.

Paul T. GOODWIN, Appellant.

No. SC 82205.

Supreme Court of Missouri.

En Banc.

April 24, 2001.

Rehearing Denied May 29, 2001.

Richard H. Sindel, Clayton, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for Respondent.

HOLSTEIN, Judge.

Defendant Paul Goodwin was convicted of first-degree murder and sentenced to death following a jury trial held in St. Louis County circuit court. Goodwin appeals, raising nine points of error. This Court has exclusive appellate jurisdiction. *Mo. Const. art. V, sec. 3.* The judgment of the trial court is affirmed.

## FACTS

■ This Court reviews the facts in a light most favorable to the verdict. *State v. Link*, 25 S.W.3d 136, 140 (Mo. banc), *cert. denied*, — U.S. —, 121 S.Ct. 634, 148 L.Ed.2d 542 (2000).

Joan Crotts, a widow in her sixties, lived alone next door to a boardinghouse in St. Louis County. In the summer of 1996, defendant moved into the boardinghouse. During defendant's short stay at the residence, he frequently harassed Mrs. Crotts and instigated a number of verbal confrontations with her. Typically, the incidents only involved vulgar insults by the defendant, directed toward Mrs. Crotts. Eventually, defendant's behavior intensified for the worse.

One day in August, defendant and several friends assembled and began drinking in the back yard of the boardinghouse. They began throwing chicken bones to Mrs. Crotts' dogs and proceeded to toss beer cans over the fence into her yard. Mrs. Crotts, upset by the activity, came out to complain and began yelling at the defendant and his friends, telling them to stop and quit harassing her. In response, defendant picked up a sledgehammer, smashed a rock with it, and threatened Mrs. Crotts, saying "this is your head...if you keep messing with me." Following

some harsh words from defendant and his companions, the episode ended without further incident.

Later that day, Mrs. Crotts left her house in order to attend a barbecue down the street. Apparently, she crossed through the front yard of the boarding-house, and defendant walked down the driveway and began chastising Mrs. Crotts for walking across the lawn. He threatened her by saying, "Get your fat ass back in the house, bitch. I've got one coming for you." At that point, Mrs. Crotts' daughter, accompanied by an acquaintance, approached them and told defendant to leave her mother alone.

Nothing more happened until that evening, when defendant was evicted from the boardinghouse. When Mrs. Crotts stepped out on her front porch to see what all the commotion was about, defendant yelled at her, "I'm going to get you for this, bitch." According to Mrs. Crotts' daughter, defendant blamed Mrs. Crotts for his eviction.

Approximately a year and a half later, in the early morning hours of March 1, 1998, Mrs. Crotts let her dogs outside. The dogs ran through an open gate in her backyard, making her suspect someone had been in the yard during the night. She investigated and found that, in addition to the open gate, a step on her back porch was out of place and that papers she kept in her new car were lying on the ground. Fearing that someone had been on her property and had tampered with her car, Mrs. Crotts contacted the police. When a police officer arrived, he walked around the house and patrolled the neighborhood in his vehicle, but found nothing amiss. Mrs. Crotts remained awake, talked with her daughter on the phone and prepared to go to church.

Meanwhile, defendant, who originally opened the backyard gate, entered Mrs. Crotts' house through an unlocked back door, sat on a chair in the basement and smoked a cigarette. Several hours passed. Eventually, defendant, carrying a hammer, climbed the basement stairs and confronted Mrs. Crotts in her kitchen. He grabbed Mrs. Crotts arm and pushed her into the living room. They sat down on the living room couch and began talking. Mrs. Crotts asked whether he wanted money or jewelry. Defendant said "[N]o." He rose from the couch and forced Mrs. Crotts into an adjacent room. After collecting his thoughts, he pushed her into the rear bedroom. Once inside the bedroom, defendant pushed her over the bed, and they laid down next to one another. Defendant exposed his penis and tried to force her to perform oral sex. Defendant, however, was unable to maintain an erection, and pushed Mrs. Crotts back into the kitchen.

As Mrs. Crotts looked out the back door window, defendant opened the refrigerator. He looked inside and found a two-liter Pepsi bottle. He pulled out the bottle and took a drink. He found some paper and a pen on the kitchen table and wrote "You are next" on the paper. Then, he seized Mrs. Crotts from behind and forced her to the open door leading to the basement stairs. He shoved her down the stairs, and she fell to the concrete basement floor. Mrs. Crotts lay face down on the concrete, unmoving. Defendant began to descend the steps, and picked up a hammer[1] by his boot. After observing Mrs. Crotts for a time, he struck her in the

---

1. Defendant gave conflicting statements to investigators regarding the hammer. In one rendition, he took the hammer upstairs when he initially confronted Mrs. Crotts. In another rendition, he indicated that he picked up the hammer for the first time while descending the basement stairs after having pushed the victim down the stairs.

back of the head several times with the hammer. He tossed the hammer toward the back of the basement, exited via the same back door through which he had entered and proceeded to Mrs. Crotts' backyard. He passed through the same gate he opened before and walked to his new home, no more than one mile away.

In the afternoon, a neighbor called Debra Decker Olive, Mrs. Crotts' daughter, to report Mrs. Crotts was not answering her phone even though her car was there. This was the second call she received that day about her mother's failure to answer the phone, so she got into her car and drove over to Mrs. Crotts' home. Once there, she entered the back door leading to the kitchen and saw her mother's purse lying on the floor along with spilled Pepsi. Ms. Olive began yelling her mother's name repeatedly. From the basement, Ms. Olive heard her mother respond, "What?" Ms. Olive went to the basement stairs and found her mother lying on the basement floor, naked except for socks and shoes and a housecoat pressed under her armpit, with a pool of blood around her head. Ms. Olive asked Mrs. Crotts if she had been raped. Mrs. Crotts replied, "I don't know." After covering her mother and placing a towel under her head, Ms. Olive called 911 and her fiancé. An officer arrived shortly, tried to make Mrs. Crotts comfortable, and asked her what happened. Her only response was, "I don't know. I don't know."

Soon paramedics arrived, administered first aid, and eventually transported Mrs. Crotts to a hospital. That evening, while awaiting surgery, another officer spoke with her about the attack at her home. She was able to respond that a very large white man, holding a hammer, appeared at the top of the basement stairs and sexually assaulted her. She indicated that the man was very angry and after the sexual assault, he pushed her down the basement stairs. After that, Mrs. Crotts explained that the man hit her in the back of the head with what she thought was a hammer. Later that evening, Mrs. Crotts died in surgery of either head injuries or heart failure.[2]

The next day, officers arrested defendant at work. Defendant, who is hearing impaired, declined the officers' offer to provide an interpreter. Officers read him the *Miranda* warning. He subsequently waived his *Miranda* rights, giving an oral statement to police admitting to being at Mrs. Crotts' home. In the statement, defendant said he had spent the evening drinking heavily at a bar called The Bottlecap. Between 11:00 p.m. and midnight, he got a ride with a co-worker who dropped him off at a Citgo gas station. Defendant began walking and eventually arrived in Mrs. Crotts' yard, opening the gate and entering the basement as detailed above. Following the completion of his statement, defendant accompanied police to the victim's house and reenacted the events of the morning of March 1.

At trial, the defense relied primarily on the theory that defendant suffered from a mental disease or defect preventing him from acting with deliberation or being responsible for his conduct. The jury convicted defendant and sentenced him to death. This appeal followed.

I.

■ Defendant challenges the trial court's decision overruling his supplemen-

2. The chief medical examiner for St. Louis County testified that Mrs. Crotts' head injuries were inconsistent with a fall down the stairs. Rather, they were inflicted by another person.

She testified at one point that the cause of death was blunt cranialcerebral trauma. At another, however, she attributed the death to heart problems.

tal motion for a new trial based on the state's failure to alert him to the statements of Dan Krabbenhoft to investigators. Defendant submits that Krabbenhoft witnessed the same event where a state's witness testified a confrontation occurred between Mrs. Crotts and Goodwin over throwing chicken bones and beer cans into Mrs. Crotts' backyard. Defendant claims Krabbenhoft told a state investigator that defendant "played" with the sledgehammer, hitting only the ground with it. Krabbenhoft denied that defendant voiced any threats toward Mrs. Crotts on the occasion he was present, or that Mrs. Crotts was even there. Krabbenhoft's statements, defendant explains, could have been used to impeach James Hall's testimony that defendant hit a rock when he swung the hammer and said to Mrs. Crotts, "This is your head if you keep messing with me." Therefore, defendant reasons that the state's failure to inform him of Krabbenhoft's statement was in violation of *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Rule 25.03(A)(9)*.

According to *Brady*, due process requires the prosecution to disclose evidence in its possession that is favorable to the accused and material to guilt or punishment. *Brady*, 373 U.S. at 87, 83 S.Ct. 1194. Evidence is material if there is a reasonable probability that had the evidence been disclosed to the defense, the result would have been otherwise. *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). The issue is not whether the defendant would more likely than not have received a different verdict with the disputed evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). A *Brady* violation occurs if: (1) the evidence is favorable to

the accused because it is exculpatory or impeaching; (2) the evidence was suppressed by the state either willfully or inadvertently; and (3) the suppression must have prejudiced the defendant. *Strickler v. Greene*, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

Rule 25.03(A)(9) provides in pertinent part:

(A)...the state shall, upon written request of defendant's counsel, disclose to defendant's counsel such part or all of the following material and information within its possession or control designated in said request:

(9) Any material or information, within the possession or control of the state, which tends to negate the guilt of the defendant as to the offense charged, mitigate the degree of the offense charged, or reduce the punishment.

At trial, defendant's theory of the case was that he suffered from a mental disease or defect and was unable to form the requisite intent. He conceded that he entered Mrs. Crotts' house and eventually beat her in the head with a hammer. In defendant's statement to the police, he maintained that he had only seen Mrs. Crotts one time while living at the boardinghouse. He stated that he did not recognize her, apparently on the day he entered her house, and never paid much, if any, attention to her. Defendant also called a psychologist who testified that defendant told her, consistent with his statement to the police, that he originally thought Mrs. Crotts' house was the boardinghouse and that he had only seen the victim once in the past. Together, he asserts that the statement and testimony suggest a lack of malice and deliberation because he was unsure of where he was going and did not have a previous ongoing conflict with his former neighbor. Krabbenhoft's testimo-

ny would have supported this position and served to impeach Hall's testimony, defendant insists.

Nevertheless, it is evident no *Brady* violation occurred here. First, Krabbenhoft's statement to the police does not impeach Hall's testimony. It is questionable that Krabbenhoft and Hall were speaking of the same event. Krabbenhoft was unsure of when he saw defendant "showing off" by pounding the ground with the sledgehammer. He indicated that there were many social gatherings held at the boardinghouse where the sledgehammer was accessible and he, Krabbenhoft, was absent. Krabbenhoft added that he owned the sledgehammer, which was always kept in the yard, and the residents of the boardinghouse played with it occasionally. Moreover, Krabbenhoft told police that he feared defendant because of his temper and propensity for violence when he consumed alcohol. He told officers that defendant disliked and harassed Mrs. Crotts. Krabbenhoft's testimony, as a whole, does not undermine Hall's testimony about what appears to have been a separate occasion. In fact, it contradicts defendant's claim to have only seen Mrs. Crotts on one day and that he was not sufficiently familiar with the area to be able to distinguish Mrs. Crotts' house from the boardinghouse.

■ Defendant's contention that the state failed to comply with Missouri disclosure rules, specifically Rule 25.03(A)(9), also fails. Although true that disclosures under Rule 25 have constitutional implications, its purpose is to permit a party to prepare for trial, eliminate surprise, and afford the accused information with which to formulate a defense and meet opposing evidence. *State v. Charity,* 637 S.W.2d 319, 323 (Mo.App.1982) (*citing State v. Wilkinson,* 606 S.W.2d 632 (Mo. banc 1980)); *State v. Trask,* 581 S.W.2d 417, 421 (Mo.App.1979). Having rejected defen-

dant's constitutional challenge under the *Brady* rule, the Court must determine whether the nondisclosure of Krabbenhoft's statements thwarted defendant's trial preparation. The state never called Krabbenhoft to testify. Therefore, defendant was not prevented from cross-examining or impeaching a state witness with his own statements. Furthermore, as noted above, any impeachment value Krabbenhoft's testimony would have offered is limited by its cumulative nature. It is also unclear how Krabbenhoft's statements, more likely to be damaging than helpful, could possibly have affected defendant's theory of defense or aided in cross-examining Hall any more than his own did. In light of this, the Court concludes defendant's trial preparation was not materially hindered and that no trial court error occurred in overruling the supplemental new trial motion on this point.

## II.

■ In his second point, defendant complains of trial court error in overruling a complaint included in his supplemental motion for a new trial regarding improper argument. Defendant failed to properly preserve this point by objecting at trial. Therefore, the Court's review is limited to the plain error standard. Under plain error review, the court looks for plain errors affecting substantial rights resulting in manifest injustice or a miscarriage of justice. *Rule 30.20.*

■ Defendant argues the prosecution injected irrelevant and inflammatory racist remarks he made to Dr. Rosalyn Shultz, a psychologist called to support his claim that he lacked mental capacity. He points out the jury included four African Americans. Defendant speculates that had the jury been composed of all white members, the state would not have asked Dr. Shultz about defendant's racist comments.

■ To support reversal, defendant offers *State v. Beal*, 966 S.W.2d 9 (Mo.App. 1997); *State v. Fox*, 916 S.W.2d 356 (Mo. App.1996); and *Saldano v. Texas*, 530 U.S. 1212, 120 S.Ct. 2214, 147 L.Ed.2d 246 (2000). *Saldano* does not help defendant's case. The Texas court failed to publish an opinion in the original appeal, and the United States Supreme Court cite only indicates the Texas court's judgment is vacated and a remand ordered in light of the fact that the Solicitor General of Texas admitted error. Nothing indicates what this case involved or explains the error admitted by the state. *Saldano*, 120 S.Ct. at 2214. Furthermore, the Texas Court of Criminal Appeals has not, at least of this date, published an opinion on remand. Defendant simply references a *New York Times* article, which apparently discusses the Supreme Court's decision. A newspaper article is neither binding nor persuasive authority in this Court.

In *Beal*, the defendant's videotaped statement to police included a reference to his previous gang affiliation. The court noted that to most jurors, gang involvement connotes unlawful or antisocial activity. Considering the fact that no evidence was presented suggesting the charged conduct was gang-related, and the defendant presented no character evidence, that portion of the statement pertaining to gang involvement was held irrelevant and improperly admitted. *Beal*, 966 S.W.2d at 14. Nevertheless, the court upheld the defendant's convictions as the overwhelming evidence of guilt negated the presumption of prejudice. *Id.*

Similarly, in *Fox*, the court held the state's introduction of testimony that the defendant was a member of a biker gang was improper. *Fox*, 916 S.W.2d at 360. Even so, the court, conducting plain error review, concluded the gang reference alone did not constitute manifest injustice. *Id.*

■ In defendant's case, unlike *Beal*, an unpreserved claim is at issue. However, he is correct that ordinarily, the bad character of an accused is unsuitable for inquiry unless he injects the issue of character into the case. *State v. Oates*, 12 S.W.3d 307, 313 (Mo. banc 2000). As with gang membership, evidence that an accused holds racist views casts him in an unsavory light. However, when viewed in context, it is apparent that the prosecutor's question was probative of a potential alternative cause for his low intelligence test scores. The record reveals:

Q: And [Defendant] told you on October 26th that he didn't like that school, he didn't like riding the bus, he didn't like the fact that it was ninety percent black people, and he didn't like the way they acted. Is that what he told you?

A: He did state that, yes.

Q: Not liking the school and the people in the school, can that have an affect [sic], Doctor, on his ability to succeed in school?

A: It—yes, it would. He didn't like the school. He felt rejected, he felt teased, he felt he didn't fit in. That would affect his own perceptions of himself and can affect, then, achievement.

Q: Oh, could it affect how he does on tests and things like that?

A: Those IQ tests are very consistent.

. . . .

Q: Now, you talked to [Defendant] further on October 26th, and he indicated to you that when he got into Wertz Vocational School he liked it better, he got along well, that it was an all-white school, on page 5, is that correct?

A: Yes, he stated that.

Q: Okay. And does that explain why his IQ may have gone up between 1980 and 1983 in any way, in that his school work got better?

The defendant injected the issue of his low intelligence as reflected by his past test scores. The trial court did not err in permitting the state to inquire about the possibility that defendant's unhappiness at a predominately African American school caused his poor test performance rather than low intelligence. No error, plain or otherwise, is apparent.

### · III.

■ Defendant's third complaint pertains to a transcript of his statement to the police. The state played an audiotape for the jury that recorded defendant's confession to police. At the same time, the state produced a written transcript of the audiotape, not for evidentiary purposes but to enable the jury to follow along while listening to the tape.

Concerned about the possibility that a portion of the audiotape referred to uncharged bad acts, the state edited out several sentences on the tape. However, the written transcript retained this exchange. The transcript reads in relevant part:

Officer: What did you have on yesterday?

. . . .

Officer: Did you have a hat, or stocking cap...

Defendant: I don't wear hats.

Officer: ...anything like that?

Defendant: I don't wear a stocking cap.

Officer: Nothing like that. Did you have any gloves on?

Defendant: That's all.

Officer: ...*sounds similar to this? Do you remember something like that a few years ago?*

Defendant: No.

(Emphasis added).

■ Defendant insists the emphasized questions by the officer included in the transcript improperly presented evidence of uncharged crimes to the jury. He is correct that, generally, evidence of uncharged crimes, wrongs, or acts is inadmissible to show an accused is predisposed to criminal conduct. *State v. Barton,* 998 S.W.2d 19, 28 (Mo. banc 1999), *cert. denied,* 528 U.S. 1121, 120 S.Ct. 945, 145 L.Ed.2d 823 (2000). Such evidence is admissible, however, if logically relevant, legitimately tends to establish directly the accused's guilt of the charges for which he is on trial, and if legally relevant because having a probative value greater than its prejudicial effect. *Id.*

The state claims the objection was not preserved. Preservation aside, vague references such as that noted above are not characterized as clear evidence linking a defendant to other crimes, *State v. Bolds,* 11 S.W.3d 633, 638 (Mo.App.1999). The questions, . . . "sounds similar to this? Do you remember something like that a few years ago?" cannot be taken for more than a vague reference. The questions come right after a thorough inquiry into defendant's attire when committing the crime and do not implicate any specific incident or act.

### IV.

Defendant next argues the trial court erred in overruling his motion for judgment of acquittal due to insufficient evidence of requisite intent. In his view, the evidence is insufficient to show he knowingly caused Mrs. Crotts' death.

■ In considering the sufficiency of the evidence on appeal, the evidence and all inferences drawn from the evidence are viewed in the light most favorable to the verdict. *State v. Ervin,* 979 S.W.2d 149, 159 (Mo. banc 1998). The Court will disregard evidence and inferences contrary to the verdict. *Id.*

■ To this end, defendant argues the evidence shows he was trying to delay Mrs. Crotts in alerting the authorities, that he was confused, and hit her with the hammer only to escape. To support these claims, he initially points out that he told his psychologist that he feared Mrs. Crotts would contact the police. However, he ignores the fact that this very fear serves to suggest motive to kill. Second, he claims he remained confused due to his excessive alcohol consumption and the loss of his hearing aid, preventing him from deliberating. This too, is unpersuasive. Evidence of voluntary intoxication is not admissible to negate the mental state of an offense. *State v. Rhodes*, 988 S.W.2d 521, 525 (Mo. banc 1999); *sec. 562.076.3*.[3] His complaint about not having his hearing aid at the time and claim that he only hit Mrs. Crotts in the back of the head with a hammer to escape add little to demonstrate he did not act knowingly.

■ In a final effort to counter any inference that he acted knowingly, defendant points out that he thought he only struck the victim one time with the hammer, the woman was alive when he left her, and she only died from heart failure[4] later in surgery. First, defendant's claim about how many blows he thought he inflicted runs contrary to the evidence when viewed in a light most favorable to the verdict. The medical examiner specifically testified that Mrs. Crotts suffered three blows from the hammer. Second, the fact that Mrs. Crotts was alive at the time he fled fails to advance defendant's argument. There is no evidence indicating that defendant even knew the victim was alive when he left, or that he did not believe she would eventually die from her injuries. Third, the fact that the victim died later in surgery required by injuries the defendant produced does not shed light on his state of mind at the time of the crime, the real issue.

■ Section 565.020.1 provides that "[a] person commits the crime of murder in the first degree if he knowingly causes the death of another person after deliberation upon the matter." In committing murder, a person acts knowingly "when he is aware that his conduct is practically certain to cause" death to another person. *Sec. 562.016.3(2)*. In the instant case, defendant pushed a sixty-two year old woman down the stairs to the concrete floor below. He followed and watched her for some time. Then, he took a hammer and struck the woman's head three times, fracturing her skull. Intent to kill or inflict serious bodily injury can be inferred from the use of a deadly weapon on some vital area of the victim's body. *State v. Mallett*, 732 S.W.2d 527, 533 (Mo. banc 1987). Certainly, striking another in the head with a hammer multiple times demonstrates intent to kill or inflict serious injury. The evidence is sufficient to establish that defendant knew his attack on Mrs. Crotts was practically certain to cause her death. Therefore, the trial court did not err in overruling defendant's motion for judgment of acquittal.

## V.

■ Defendant's fifth challenge again involves the state's cross-examina-

---

3. All statutory references are to RSMo 2000.

4. The parties dispute the cause of death. In truth, the record supports either of two conclusions. At one point, the physician testified Mrs. Crotts died from blunt cranialcerebral trauma, blunt injury to the head. At another, she stated that Mrs. Crotts had a heart condition which, due to the tremendous stress placed upon her, caused her death. See footnote 2. Either way, defendant's conduct proximately caused Mrs. Crotts' death, and the precise cause of death has no bearing on his mental state at the time of striking his victim.

tion of Dr. Schultz. He argues here that the trial court erred in permitting the state to inquire as to the psychologist's knowledge of prior bad acts and criminal charges. Generally, evidence of prior bad acts or crimes is inadmissible unless logically and legally relevant to the present charge. *State v. Barton*, 998 S.W.2d 19, 28 (Mo. banc 1999), *cert. denied*, 528 U.S. 1121, 120 S.Ct. 945, 145 L.Ed.2d 823 (2000). But trial courts retain broad discretion in deciding the permissible scope of cross-examination, and an appellate court will not reverse a conviction absent an abuse of that discretion. *State v. Oates*, 12 S.W.3d 307, 313 (Mo. banc 2000). An expert witness may be cross-examined about facts not in evidence to test the validity of his opinion. *State v. Parker*, 886 S.W.2d 908, 927 (Mo. banc 1994). Where a psychological expert's opinion of mental illness is before the court, the validity and weight of the opinion may be tested on cross-examination concerning the expert's knowledge of fact surrounding the defendant's mental status, including the accused's past interactions that bear on the opinion. *State v. Smith*, 32 S.W.3d 532, 550 (Mo. banc 2000). This necessarily implies wide latitude in cross-examining such experts to test the factual basis for the opinion. *Parker*, 886 S.W.2d at 927.

■ Dr. Shultz indicated at trial and in her report that her opinions were based, at least in part, on a history provided by defendant. Specifically, her report noted that her conclusions about defendant's faculties at the time of the crime were supported by the fact that he had "no history of significant criminality or violence ." The prosecutor then inquired as to what Dr. Shultz considered significant and proceeded to ask her whether defendant informed her of an incident resulting in assault and robbery charges at the Lake of the Ozarks. Defendant told Dr. Shultz he

simply had become drunk and hit someone. Dr. Shultz admitted that she did not investigate the matter further and that she simply took defendant's word for it. Dr. Shultz later testified that she believed defendant's claim that he and his former girlfriend never had a physical fight, that "he only hit her one time—not hard—and didn't hurt her." Dr. Shultz stated that she also failed to corroborate this statement and testified that although the police were called, no charges were brought. At that point, the prosecutor asked whether she had seen police reports indicating defendant had been arrested for assaulting the woman in December 1994 and April 1995.

In a case such as this, where the defendant concedes killing the victim and the only issue is whether his mental state absolves him from responsibility, psychological expert testimony is particularly crucial. Here, the expert's report indicated that her opinion, given at trial, was based in part upon a lack of significant history of crimes or violence. The state was entitled to test the depth of her knowledge about that history. The precise issue was addressed in *Smith*. The defendant's remedy was to seek an instruction that the jury may not consider the defendant's statements to Dr. Shultz in determining his guilt. *Smith*, 32 S.W.3d at 550; *See also MAI–CR3d 306.04*. The trial court did not abuse its discretion in permitting this line of questioning or in denying defendant's motion for a mistrial.

## VI.

■ The sixth claim raised by defendant relates to testimony given by a police officer who interviewed Mrs. Crotts from her hospital bed following the attack. The officer testified that Mrs. Crotts stated she was forced to engage in oral sex in the living room, was pushed down the base-

ment stairway, and thought she was hit in the head by a hammer. Defendant argues the statement constitutes hearsay and was inadmissible as a dying declaration because no evidence existed suggesting Mrs. Crotts believed herself to be in danger of dying. However, defendant failed to object at trial or raise the issue in his motion for a new trial, so it is unpreserved for appellate review. *State v. Clemons*, 946 S.W.2d 206, 224 (Mo. banc 1997). Nevertheless, defendant requests plain error review under Rule 30.20.

■ Defendant maintains that because Mrs. Crotts' statements provided evidence of sodomy, not found elsewhere in the case, it constitutes plain error. Defendant, however, ignores his own statements to the police, admitted into evidence, where he indicated he tried to get Mrs. Crotts to engage in oral sex. An allegedly wrongful admission of hearsay testimony does not constitute plain error if such testimony is merely cumulative to other evidence properly admitted. *State v. Dixon*, 24 S.W.3d 247, 251 (Mo.App.2000). No plain error is evident.

## VII.

■ In his seventh claim of error, defendant complains that the evidence was insufficient to support the submission of two of three statutory aggravators found by the jury.[5] Specifically, he contends there was insufficient evidence that the murder was committed while he was engaged in attempting forcible sodomy and that he killed the victim while she was helpless. The test for challenging the sufficiency of the evidence to support an aggravating circumstance is whether a reasonable juror could find from the evidence that the proposition advanced is true be-

yond a reasonable doubt. *State v. Kinder*, 942 S.W.2d 313, 332 (Mo. banc 1996). In reviewing challenges to the sufficiency of the evidence, this Court accepts as true all evidence favorable to the state, including all favorable inferences drawn from the evidence. *Id.*

■ Defendant asserts that outside of Mrs. Crotts' statements during the bedside interview with police, no evidence demonstrates this murder was committed while he was engaged in forcible sodomy. He reargues that these statements are hearsay and inadmissible. Nevertheless, it well-established law in Missouri that hearsay admitted without objection may properly be considered as evidence by the trier of fact. *State v. Cuno*, 869 S.W.2d 285, 286 (Mo.App.1994). Taking the evidence together with his own admissions in a light favorable to the prosecution, a reasonable juror could find defendant broke into the victim's house and coerced her to engage in sodomy as a prelude to her murder.

■ Defendant also challenges the finding that he killed Mrs. Crotts while she was helpless, claiming the evidence demonstrates she did not die in his presence. In fact, he argues, she died some twelve hours later in surgery. Defendant misses the point. The evidence is sufficient to establish that his conduct, in beating an undressed woman lying with a broken hip and eight fractured ribs on her basement floor multiple times with a hammer, proximately caused her death. The action leading to that death was taken while the victim was helpless. It is unnecessary that the victim actually die in the presence of the defendant. A reasonable juror

---

**5.** Although defendant claims four statutory aggravators were found out of five submitted, it is clear that four were submitted, three of

which were found by the jury. Defendant double counts aggravator number one. The confusion is addressed in Part VIII.

could have found this aggravator beyond a reasonable doubt.

## VIII.

■ Next, defendant contends that one statutory aggravator did not comply with MAI–CR3d 313.40. He cites the rule providing that an applicable MAI instruction is to be given to the exclusion of any other. *Rule 28.02(c)*. Furthermore, he insists that this aggravator would have weighed heavily on the juror's minds, and having found this aggravator, it was much easier for them to find each subsequent aggravator. Defendant failed to preserve this point for appellate review. Therefore, the Court's review is for plain error. *Rule 30.20; State v. Clayton*, 995 S.W.2d 468, 483 (Mo. banc), *cert. denied*, 528 U.S. 1027, 120 S.Ct. 543, 145 L.Ed.2d 421 (1999).

The aggravating factors instruction reads:

In determining the punishment to be assessed against the defendant for the murder of Joan Decker Crotts, you must first unanimously determine whether one or more of the following statutory aggravating circumstances exists:

1. Whether the murder of Joan Decker Crotts involved depravity of mind and whether, as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhuman. You can make a determination of depravity of mind only if you find that the defendant committed repeated and excessive acts of physical abuse upon Joan Decker Crotts and the killing was therefore unreasonably brutal, and

2. That the defendant killed Joan Decker Crotts after she was rendered helpless by defendant and that defendant thereby exhibited a callous disregard for the sanctity of all human life, and

3. Whether the murder Joan Decker Crotts was committed while the defendant was engaged in the perpetration of a burglary

A person commits the crime of burglary when he knowingly enters unlawfully or knowingly remains unlawfully in a building or inhabitable structure for the purpose of committing assault.

A person commits the crime of assault if he attempts to or knowingly cause [sic] or attempts to cause physical injury to another person.

. . . .

The most reasonable conclusion is that despite the numbering, each aggravating circumstance begins with the word "whether," making aggravating circumstance number two a subset of aggravating circumstance number one.

Another possible interpretation of the instruction is that these findings incorporated into aggravators number one and two were joined to the burglary aggravator by the conjunction "and," thus requiring all three to be found for the state in order to assess the death penalty. At worst, the state took on the greater burden of establishing both the aggravating factor that the murder was outrageously and wantonly vile, horrible, and inhuman because of repeated acts of abuse to the victim, *and* that the victim was rendered helpless so as to exhibit a callous disregard for the sanctity of all human life, *and* that the murder of Joan Decker Crotts was committed while the defendant was engaged in the perpetration of a burglary.

■ Even if the instruction was in error because the aggravating circumstances were improperly conjoined, reversal would not be necessary as a death sentence will be affirmed if even one valid statutory aggravating circumstance is found. *State v. Taylor*, 18 S.W.3d 366, 378 (Mo. banc),

*cert. denied,* —— U.S. ——, 121 S.Ct. 238, 148 L.Ed.2d 170 (2000). Since there were two independent statutory aggravators found by the jury, burglary and attempted forcible sodomy, defendant's sentence will stand. His speculation that the finding of the disputed aggravator somehow made it easier for the jury to find the other two does not give rise to a possibility of manifest injustice. The jury, by its verdict, did not seem to be confused or misled. There is no plain error relating to this claim.

## IX.

In his ninth and final claim, defendant asks the Court to engage in independent review of the case pursuant to sec. 565.035. That statute requires the Court to determine in each death penalty case:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstance found;

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant.

Initially, defendant asserts that his death sentence was the product of prejudice arising from what he calls the prosecution's playing of the "race card." Specifically, he reargues point number two, maintaining that the state's cross-examination of Dr. Shultz, which inquired as to whether being unhappy at a predominately African American school was a viable alternative for his poor test performance, played a significant part in his death sentence.

For the reasons outlined in Part II, the Court concludes the cross-examination was proper. Without re-addressing the issue, the Court's task here is satisfied by noting that, for the most part, defendant admitted his conduct and the reference to his dislike for African–Americans was an isolated reference, not revisited time and again by the prosecution either in questioning or argument. Absolutely no evidence exists supporting defendant's position that this one reference motivated the jury to give the death sentence.

The sufficiency of the evidence to support two of the three aggravating circumstances was addressed in Part VII. However, the Court notes that sufficient evidence supported a finding that: (1) the murder involved a depraved mind, involving repeated acts of physical abuse and a killing after rendering the victim helpless; (2) the murder was committed while defendant was engaged in a burglary; and (3) the murder was committed while the defendant was attempting to commit forcible sodomy.

Finally, the Court turns to its proportionality review of defendant's sentence. Considering the crime, the overwhelming evidence of guilt and defendant's particular circumstances, the Court cannot conclude the death sentence is excessive and disproportionate in this case. The death penalty has been upheld repeatedly when a murder involves a depraved mind. *State v. Johnson,* 22 S.W.3d 183 (Mo. banc 2000); *State v. Kinder,* 942 S.W.2d 313 (Mo. banc 1996); *State v. McMillin,* 783 S.W.2d 82 (Mo. banc 1990). It has also been upheld when a defendant murders someone who is helpless or who he renders helpless. *State v. Tokar,* 918 S.W.2d 753 (Mo. banc 1996); *State v. Murray,* 744 S.W.2d 762 (Mo. banc 1988); *State v.*

*Walls,* 744 S.W.2d 791 (Mo. banc 1988). The death penalty has been imposed on defendants who committed murder in the first degree while engaged in the perpetration or attempted perpetration of a burglary in the victim's home. *State v. Kreutzer,* 928 S.W.2d 854 (Mo. banc 1996); *State v. Ramsey,* 864 S.W.2d 320 (Mo. banc 1993); *State v. Griffin,* 756 S.W.2d 475 (Mo. banc 1988).

Nevertheless, defendant stresses his low I.Q.,[6] relatively insignificant history of criminal convictions, hearing disability, difficulties in his personal life, and intoxication at the time in question. He submits these factors mitigate in favor of commuting his sentence to life imprisonment without the possibility of parole. However, each of these issues was presented to and argued before the jury. The death penalty has been upheld in cases where the defendant presented evidence of low intelligence. *State v. Johnson,* 22 S.W.3d 183 (Mo. banc), *cert. denied,* — U.S. —, 121 S.Ct. 322, 148 L.Ed.2d 259 (2000); *State v. Richardson,* 923 S.W.2d 301 (Mo. banc 1996); *State v. Powell,* 798 S.W.2d 709 (Mo.banc 1990). This Court has also affirmed death sentences where the defendant was under the influence of drugs or alcohol at the time of the murder. *State v. Knese,* 985 S.W.2d 759 (Mo. banc 1999); *State v. Owsley,* 959 S.W.2d 789 (Mo. banc 1997); *State v. Hutchison,* 957 S.W.2d 757 (Mo. banc 1997).

Given the crime, the strength of evidence, and this defendant, the Court concludes the death penalty is not disproportionate or excessive.

### X.

The judgment of the trial court is affirmed.

6. Defendant's full-scale I.Q. over the last twenty years tested at levels between 72 and

PRICE, C.J., LIMBAUGH, WHITE, WOLFF and BENTON, JJ., and EDWARDS, Sp.J., concur.

LAURA DENVIR STITH, J., not participating.

94. He was not diagnosed as retarded by any expert.