STATE of Missouri, Respondent,

v.

Ronald WRIGHT, Appellant.

No. ED 97219.

Missouri Court of Appeals,
Eastern District,
Division Four.

Sept. 4, 2012.

Craig A. Johnston, Assistant Public Defender, Columbia, MO, for appellant.

Daniel N. McPherson, Assistant Attorney General, Jefferson City, MO, for respondent.

PATRICIA L. COHEN, Judge.

### Introduction

Ronald Wright (Defendant) appeals the judgment of conviction entered after a jury found him guilty of first-degree murder, armed criminal action, and first-degree burglary. Defendant claims the trial court erred in prohibiting: (1) Defendant's expert witness from testifying that Defen-

dant suffered from a drug-induced psychosis that rendered him incapable of coolly reflecting or premeditating upon his actions; (2) Defendant from testifying about his mental health history; and (3) Defendant's mother from testifying that she observed Defendant exhibiting anxious and strange behavior two days prior to the charged offenses. We affirm.

### Factual and Procedural Background

In October 2008, Defendant was on both probation and parole. The conditions of Defendant's probation and parole included obeying all laws and maintaining employment. On October 15, 2008, Defendant's employer terminated Defendant and called the police after Defendant pushed a construction-site foreman off a ladder.

On October 16, 2008, at approximately 11:00 a.m., Lewis Helton, Defendant's supervising probation and parole officer, telephoned Defendant and directed him to report to Helton's office at 1:00 p.m. regarding alleged violations of his probation and parole conditions.

Around 1:00 p.m. that day, Joyce Hayes, a resident of a subdivision in Farmington, observed Defendant sitting in his truck while parked across the street from John and Jean Shaw's house. Hayes watched Defendant drive around the subdivision, stopping outside various houses and at a construction site. Eventually, Defendant drove through a field and backed his truck into the Shaws' driveway.

The Shaws, a couple in their seventies, were at home watching television when Defendant knocked on their door. Mr. Shaw, who was in frail health and walked with a cane, answered the door. Defendant told Mr. Shaw that he was looking for someone else and returned to his truck but did not leave the Shaws' driveway. Feeling increasingly nervous about Defendant's continued presence, Mrs. Shaw gathered some tools, including a short-handled sledgehammer, and placed them on a stool by the front door.

Defendant suddenly broke into the Shaws' home, threw Mr. Shaw to the floor, and began punching him. Mrs. Shaw threw an ashtray at Defendant, hitting him in the arm. When Defendant started moving toward Mrs. Shaw, she ran out the back door with a cordless phone, called the police, and hid in some brush.

When the police arrived, they found Mr. Shaw's body in the living room. His head appeared to be "smashed in" and there was blood on the floor and ceiling. Mr. Shaw's autopsy revealed that the cause of death was "blunt trauma from some instrument to the head." The pathologist counted at least eight blows to Mr. Shaw's head, which were "completely consistent" with a sledgehammer as the cause of the blunt trauma.

At about 3:00 p.m. on October 16, 2008, Jerald Wells was at his home in Valley Mines when he heard his garage door close. Wells entered the garage and found Defendant standing beside Defendant's truck, which he had parked in Wells's garage. After Wells ordered Defendant to leave, Defendant returned to his truck and backed it out of the garage, but the truck stalled in the driveway. Wells watched Defendant walk down the street, steal a truck belonging to Wells's neighbor, and drive the truck down a dead-end street. Wells drove his own truck after Defendant and blocked in Defendant until the police arrived and arrested Defendant.

Crime scene investigators seized from the Shaws' house a sledgehammer and an electric hand massager, which was located near Mr. Shaw's body. Latent fingerprint testing revealed Defendant's fingerprint on the massager, and DNA testing showed that the bloodstains on the sledgehammer and on the pants and shoes Defendant was

wearing at the time of his arrest were consistent with Mr. Shaw's blood.

The State charged Defendant with first-degree murder, armed criminal action, and first-degree burglary.[1] Prior to trial, the prosecutor filed a motion to preclude testimony regarding mental disease or defect or diminished capacity. The prosecutor alleged that Defendant had retained Dr. Richard Scott, a psychologist, who performed a forensic psychological evaluation of Defendant and concluded that Defendant suffered from an "amphetamine-induced psychotic disorder" that rendered him incapable of premeditation at the time he killed Mr. Shaw. The prosecutor argued that drug-induced psychosis is not a mental disease or defect but rather "intoxication or a drugged condition resulting from the ingestion of amphetamine" and Dr. Scott's testimony was therefore inadmissible. After hearing arguments, the trial court sustained the State's motion to preclude testimony.

The prosecutor also filed a motion in limine seeking to exclude evidence of Defendant's drugged condition. The prosecutor argued that Section 562.076 prohibits the admission of evidence of a drugged condition "for the purpose of negating a mental state which is an element of the offense." Mo.Rev.Stat. § 562.076.3.[2] At the pretrial hearing on the State's motion, defense counsel responded that he planned to elicit testimony that Defendant was hearing voices, but he did not intend to present evidence of Defendant's voluntary drug use.

At the jury trial, Defendant and Defendant's mother, Bernice Wright, testified

for the defense. Defendant testified that, on the morning of October 16, 2008, he awoke hearing voices in his head and had "a real bad feeling . . . that there was bad things going on."[3] Defendant began driving to the home of his friend Mark Sitzes because he heard Sitzes's voice telling him to do so. As he was driving, Sitzes's voice directed Defendant to turn into the Shaws' subdivision in Farmington. Defendant drove around the subdivision looking for signs. Eventually, he returned to the Shaws' house because he believed an American flag was pointing toward the house to signal that he should go there.

Defendant testified that, after he knocked on the Shaws' door and spoke briefly to Mr. Shaw, he returned to his truck and heard Sitzes ask, "Where are you going?," as if Defendant was not supposed to leave. Defendant sat in his truck "quite a while" until Mr. Shaw came outside and asked him to leave. Defendant heard Sitzes's daughter say, "I'd hit him," and Defendant hit Mr. Shaw with a framing hammer from Defendant's tool belt.

The "next thing" Defendant remembered was being inside the Shaw residence and seeing Mrs. Shaw run away. Defendant remembered hitting Mr. Shaw with the sledgehammer, but Defendant did not recall how many times because he "blanked out." On cross-examination, Defendant testified that he did not remember deciding to kill Mr. Shaw.

Defendant's mother, Bernice Wright, testified that she saw Defendant on the evening of October 14, 2008. When defense counsel attempted to elicit testimony

---

1. The State based the burglary charge on the theory that Defendant remained unlawfully in the Shaw home for the purpose of assaulting Mr. Shaw.

2. All statutory references are to RSMo 2000 as supplemented unless otherwise indicated.

3. Defendant believed that "[p]eople was watching me, following me, coming into my house and stuff." Defendant also believed that "these people had" his brother and had planted a speaker in his ear.

about Defendant's demeanor on that date, the prosecutor objected on the grounds of relevance and defense counsel made an offer of proof outside the presence of the jury. Defense counsel stated that he anticipated that Mrs. Wright would testify that on October 14, 2008,

> [Defendant] was extremely depressed, very distressed, having all sorts of problems with anxiety. That he had shaved his head, which I anticipate she will testify that this is something that he had never done before. And she was extremely worried about his mental health at that time.

In response, the prosecutor argued that evidence of Defendant's behavior two days prior to the crimes charged was irrelevant and prejudicial. The trial court ruled that the proffered testimony was inadmissible.

Defense counsel then called Defendant to the stand to make an offer of proof regarding his history of drug abuse and mental health issues. Defendant testified that he had been using methamphetamines "off and on" since 1999, was a "heavy user," and had used methamphetamines on October 15, 2008. Defendant testified that he experienced auditory hallucinations five or six times prior to October 16, 2008, and he had been committed to the "state hospital" four times. Defendant stated that he did not use methamphetamines on October 16, 2008. On cross-examination, Defendant acknowledged that his use of methamphetamines on October 15, 2008 was voluntary.[4]

Finally, defense counsel called Dr. Scott, a psychologist and certified forensic examiner, to make an offer of proof. Dr. Scott testified that, after performing a forensic evaluation of Defendant, he concluded that, at the time Defendant committed the charged offenses, Defendant "was suffering a methamphetamine induced psycho-sis." Dr. Scott further found that, "as a result of that methamphetamine induced psychosis, [Defendant] was not capable of coolly reflecting or premeditating on his actions."

Dr. Scott testified that, in reaching the conclusion that Defendant had diminished capacity, he relied upon Defendant's hospital records:

> The historical information included evidence from four psychiatric hospitalizations—three in 2003, and another in 2006. Each of these hospitalizations was at Southeast Missouri Medical Center. Three of them were involuntary commitments, 96 hour holds.

> And in each case it was found that he had been using methamphetamine for a sustained period of time and had become psychotic or psychotic and depressed. And during those hospitalizations, they documented auditory hallucinations, delusional beliefs of various types, disorganized and confused behavior.

> And in all of the hospitalizations as he was treated with anti-psychotic and anti-depressant medication, his symptoms resolved. In each case, the use of methamphetamine was identified as a precursor to the onset of the psychotic symptoms. And so I had historical data prior to the alleged offense that led me to conclude that this was a man who when he used methamphetamines excessively, he became psychotic.

At defense counsel's request, Dr. Scott explained the term "drug induced psychosis":

> [Scott]: Well, essentially the use of drugs causes intoxication. Methamphetamine causes elation, a great sense of confidence, can be associated with hyperactivity, jitteriness.

---

4. Although the transcript does not reflect the trial court's ruling as to this offer of proof, the trial court apparently ruled Defendant's proposed testimony inadmissible.

Individuals that use methamphetamine excessively, either very high doses or chronically can then go and develop a separate condition, a psychosis that is caused by methamphetamine use.

So rather than the meth just causing the high, it causes the high plus these very serious psychotic symptoms. The symptoms can resolve in days or weeks after the person stops using methamphetamine and will resolve more quickly if they're treated with medications.

. . . .

[Defense counsel]: And, again, what do you expect to see when you see someone becoming psychotic or when they do become psychotic from using methamphetamine chronically?

[Scott]: Well, it's a mimic of schizophrenia. . . . And so it in many ways looks like schizophrenia, but when the person is separated from the methamphetamine and the persisting symptoms resolve or are directly treated, we find that there is no underlying mental illness that's just been exacerbated. It's the substance abuse psychosis that we're seeing rather than schizophrenia, though they look very much alike.

[Defense counsel]: So is it your opinion then that drug induced psychosis is something different than let's say voluntary intoxication?

[Scott]: Absolutely.

[Defense counsel]: And in what way?

. . . .

[Scott]: The essential difference is that methamphetamine is a drug that causes a particular type of intoxication. I described it, the elation, the hyperactivity, et cetera. It is not a normal aspect of intoxication with methamphetamine for the individual to become psychotic, to hallucinate, to become so paranoid that they develop delusions, that sort of thing.

And so when someone does develop those symptoms, they have shifted or converted from simply being intoxicated on the drug to developing a psychosis with an underlying cause being, in that case, methamphetamine.

Dr. Scott also testified that drug-induced psychosis is recognized by the American Psychiatric Association and included in the Diagnostic and Statistical Manual of Mental Disorders. In Dr. Scott's opinion, as a result of Defendant's drug-induced psychosis, Defendant did not have the requisite intent to commit first-degree murder.

After the trial court denied Defendant's offers of proof, Defendant rested. The jury found Defendant guilty of first-degree murder, armed criminal action, and first-degree burglary. The trial court sentenced Defendant as a prior and persistent offender to consecutive sentences of life imprisonment without probation or parole for first-degree murder, 200 years' imprisonment for armed criminal action, and life imprisonment for first-degree burglary. Defendant appeals his conviction for first-degree murder.

### *Standard of Review*

A trial court has broad discretion to admit or exclude evidence at trial, and we will reverse a trial court's ruling on the admission of evidence only if the court has clearly abused its discretion. *State v. Forrest* 183 S.W.3d 218, 223 (Mo. banc 2006). A trial court abuses its discretion when its "ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration." *Id.* (quotation omitted). Additionally, we review the trial court "for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *Id.* at 223–24 (quotation omitted). "Trial court error is not prejudicial unless there is a reason-

able probability that the trial court's error affected the outcome of the trial." *Id.* at 224.

### Discussion

In his first point on appeal, Defendant claims the trial court abused its discretion in excluding the expert witness testimony of Dr. Scott, which Defendant sought to present in support of his "diminished capacity" defense to first-degree murder. Specifically, Defendant contends that the trial court should have permitted Dr. Scott to testify that, at the time of the murder, Defendant suffered from a mental disease or defect, namely drug-induced psychosis, that rendered him incapable of coolly reflecting or premeditating upon his actions.

"A person who is in an intoxicated or drugged condition, whether from alcohol, drugs or other substance, is criminally responsible for conduct unless such condition is involuntarily produced...." Mo.Rev. Stat. § 562.076.1. For this reason, a criminal defendant may not introduce evidence of voluntary intoxication or drugged condition for the purpose of negating a mental state which is an element of the offense charged. Mo.Rev.Stat. § 562.076.3; *State v. Goodwin,* 43 S.W.3d 805, 816 (Mo. banc 2001).

While a defendant may not negate the required mental state with evidence of voluntary intoxication, a defendant may present evidence of a mental disease or defect "[t]o prove that the defendant did or did not have a state of mind which is an element of the offense." Mo.Rev.Stat. § 552.015.2(8). The statutory definition of mental disease or defect provides that "[t]he terms 'mental disease or defect' do not include alcoholism without psychosis or drug abuse without psychosis...." Mo. Rev.Stat. § 552.010.

■ Defendant argues that Section 552.010 implicitly recognizes drug abuse *with* psychosis as a mental disease or defect and the trial court therefore erred in excluding Dr. Scott's testimony that Defendant suffered from a drug-induced psychosis that rendered him incapable of the deliberation required to commit first-degree murder.[5] The State counters that Defendant could not use a defense of diminished capacity based on a diagnosis of drug-induced psychosis because, under Missouri law, "voluntary drug use does not negate a mental state in the absence of a separate mental disease that results in diminished capacity without the voluntarily ingested drug."

Defendant's offer of proof established that Dr. Scott would have testified that Defendant's use of methamphetamines caused his psychosis. Based upon his evaluation, Dr. Scott concluded that "this was a man who when he used methamphetamines excessively, he became psychotic." In support of his conclusion, Dr. Scott pointed to the fact that, in each of Defendant's four psychiatric hospitalizations, "the use of methamphetamine was identified as a precursor to the onset of the psychotic symptoms." Consistent with Dr. Scott's diagnosis of drug-induced psychosis, the record shows that Defendant ingested methamphetamine on October 15, 2008, the day before he exhibited psychotic symptoms and murdered Mr. Shaw.

Additionally, Dr. Scott's description of drug-induced psychosis clearly demonstrated that drug use directly caused Defendant's psychosis. Dr. Scott explained that, while methamphetamine generally causes a sense of elation and hyperactivity, individuals who "use methamphetamine excessively ... can then go and develop a

---

**5.** Under Section 565.020.1, "[a] person commits the crime of murder in the first degree if he knowingly causes the death of another person after deliberation upon the matter." Mo.Rev.Stat. § 565.020.1.

separate condition, a psychosis that is caused by methamphetamine use." In the "relatively rare" cases that someone becomes "psychotic recurrently as a result of methamphetamine use," that person has "shifted or converted from simply being intoxicated on the drug to developing a psychosis with an underlying cause being ... methamphetamine."

The Missouri Supreme Court has held that, if a defendant's "underlying mental condition does not result in diminished capacity without the [voluntarily ingested] drug, the presence of the drug does not change the evidentiary calculus." *State v. Roberts*, 948 S.W.2d 577, 589 (Mo. banc 1997). Likewise, this court has held in a factually similar case that drug-induced intoxication, even when it results in psychosis, does not constitute a mental disease or defect where the psychosis was caused by voluntary drug use. *State v. Elam*, 779 S.W.2d 716, 717 (Mo.App. E.D.1989). In *Elam*, the defendant, who was charged with first-degree assault and armed criminal action, presented a defense of mental disease or defect. *Id.* Two experts testified that Defendant was suffering from a psychosis induced by the voluntary ingestion of PCP. *Id.* After closing arguments, the judge rejected the defendant's defense of mental disease or defect because "the psychosis had to exist prior to the ingestion in order to qualify under the law that says if you've got alcohol plus a psychosis you can submit it." *Id.* This court affirmed, holding that the defendant's "testimony that he ingested the PCP voluntarily prevents his assertion of a defense based on mental disease or defect resulting from the drug." *Id.; see also State v. Mouse*, 989 S.W.2d 185, 189 (Mo. App. S.D.1999) (overturned on other grounds) (holding that trial court did not err in excluding expert testimony that the defendant suffered from a drug-induced psychosis at the time of the charged assault because the psychosis was a result of

the defendant's voluntary ingestion of amphetamines); *State v. McGreevey*, 832 S.W.2d 929, 931 (Mo.App. W.D.1992) (holding that the trial court did not err in excluding expert witness testimony that the defendant was suffering from "cocaine induced delirium or dementia" where there was no showing that the defendant's mental state was the result of involuntary drug use).

Defendant attempts to distinguish *Elam, Roberts,* and *Mouse* by arguing that, unlike the defendants in those cases, who "consumed drugs or alcohol on the date of the offense," Defendant was not in a "drugged condition" when he murdered Mr. Shaw. Defendant states: "Although prior methamphetamine use might have been a precursor, he was suffering from a psychosis." However, Dr. Scott's testimony clearly established that Defendant's psychosis did not exist independently of Defendant's drug use. Furthermore, in *State v. Rhodes*, the Missouri Supreme Court held that evidence that the defendant was "crashing" from crack cocaine intoxication when he killed the victim constituted inadmissible evidence of voluntary intoxication. 988 S.W.2d 521, 525 (Mo. banc 1999).

Additionally, Defendant cites *State v. Shipman* for the proposition that, if a psychosis exists, "how or why the mental disease or defect arose should be of no moment." 568 S.W.2d 947, 950–51 (Mo.App. 1978). In *Shipman*, the defendant, a self-proclaimed drug addict who was charged with attempted burglary and possession of burglary tools, sought to present a defense of diminished capacity. 568 S.W.2d at 949. On appeal, the defendant claimed that the trial court erred in excluding his mother's answer to the question of whether she had an opinion "as to whether [defendant] ... knew right from wrong?" *Id.* at 950. In analyzing the propriety of excluding the

mother's testimony, the court discussed the context of the proposed testimony. *Id.* First, the court noted that the jury would have to determine "whether the defendant, at the time of the crime and as the result of drug-induced psychosis, did not know or appreciate the nature, quality or wrongfulness of his conduct...." *Id.* In addition, the court stated as follows:

> While it must be recognized that drug addiction without psychosis is not a defense, a mental disease or defect which results in insanity or the inability to distinguish right from wrong is still a defense although the disease or defect had its origin and was nurtured into legal irresponsibility through drug abuse or addiction. Stated differently: If a psychosis exists by reason of defendant's inability to tell right from wrong or inability to know or appreciate the nature, quality or wrongfulness of his conduct or incapacity to conform his conduct to the requirements of law, how or why the mental disease or defect arose should be of no moment.

*Id.* at 951 (internal citations omitted).

Importantly, at the time *Shipman* was decided, Missouri law allowed a criminal defendant to introduce evidence of voluntary intoxication as a defense to crimes requiring a mental state of purposely or knowingly.[6] Mo.Rev.Stat. § 562.076 (1978); *Elam,* 779 S.W.2d at 717 n. 1. In 1984, the legislature amended Section 562.076 to prohibit the admission of evidence of voluntary intoxication for the pur-

pose of negating a mental state that is an element of the offense. Mo.Rev.Stat. § 576.076.3; *see also Mouse v. State,* 90 S.W.3d 145, 148 (Mo.App. S.D.2002). Given this significant change in the governing law, it is unlikely that the court's comments in *Shipman* with respect to psychosis induced by voluntary drug intoxication are applicable here. We therefore decline to follow *Shipman* and instead follow the more recent decisions in *Roberts, Elam, Mouse,* and *McGreevey. Roberts,* 948 S.W.2d at 589; *Mouse,* 989 S.W.2d at 189; *McGreevey,* 832 S.W.2d at 931; *Elam,* 779 S.W.2d at 717. Accordingly, we conclude that the trial court did not err when it refused to permit Dr. Scott to testify that, as a result of drug-induced psychosis, Defendant lacked the requisite intent to commit first-degree murder.

Defendant also contends that Section 562.076.3 "would be unconstitutional under Justice Ginsburg's concurrence [in *Montana v. Egelhoff,* 518 U.S. 37, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996) ] if this Court holds that the proffered evidence was properly excluded." In *Egelhoff,* Justice Ginsburg concluded that a Montana statute providing that voluntary intoxication "may not be taken into consideration in determining the existence of a mental state which is an element of [a criminal] offense" did not violate the Due Process Clause because the statute was not "a rule designed to keep out relevant, exculpatory evidence," but rather a redefinition of the mental-state element. 518 U.S. at 57–58,

---

**6.** Prior to its amendment in 1984, Section 562.076 provided:

1. A person who is in an intoxicated or drugged condition whether from alcohol, drugs or other substance, is criminally responsible for conduct unless such condition
   (1) Negatives the existence of the mental states of purpose or knowledge when such mental states are elements of the offense charged or of an included offense; or

(2) Is involuntarily produced and deprived him of the capacity to know or appreciate the nature, quality or wrongfulness of his conduct or to conform his conduct to the requirements of law.

2. The defendant shall have the burden of injecting the issue of intoxicated or drugged condition.

Mo.Rev.Stat. § 562.076 (1978); *see also Mouse v. State,* 90 S.W.3d 145, 148 (Mo.App. S.D.2002).

116 S.Ct. 2013. Justice Ginsburg explained: "Defining *mens rea* to eliminate the exculpatory value of voluntary intoxication does not offend 'a fundamental principle of justice,' given the lengthy common-law tradition and the adherence of a significant minority of the States to that position today." *Id.* at 50, 116 S.Ct. 2013. The Missouri Court of Appeals has considered the constitutionally of Section 562.076 in light of *Egelhoff* and held that the Missouri statute does not violate a defendant's rights under the Due Process Clause. *State v. Fanning*, 939 S.W.2d 941, 948 (Mo.App. W.D.1997); *see also Gary v. Dormire*, 256 F.3d 753, 759 (8th Cir.2001) (holding that Section 562.076 does not violate the Due Process Clause). Point denied.

In his second point on appeal, Defendant claims the trial court abused its discretion in prohibiting him from testifying about his prior mental health history, including previous auditory hallucinations, psychiatric hospitalizations, and bizarre behavior. Defendant contends that this evidence "would have supported his defense that he did not deliberate before killing the victim because he was suffering from a psychosis, including having auditory hallucinations that instructed him to kill the victim." In his third point on appeal, Defendant argues that the trial court abused its discretion in limiting the testimony of Defendant's mother, Bernice Wright, who would have testified that she observed Defendant behaving strangely two days before the charged crimes. In so far as these claims of error essentially restate Defendant's argument that the trial court abused its discretion in excluding evidence of drug-induced psychosis, which Defendant claims is a "mental disease or defect" under Sec-tion 552.010, we reject Defendant's Points II and III for the reasons discussed above.

■■■ Defendant also argues that Defendant's and Mrs. Wright's proposed testimony relating to his "voluntarily drugged condition" was "otherwise relevant on issues of conduct" and therefore admissible under Section 562.076.3.[7] However, at the pretrial hearing on the State's motions in limine and at trial, defense counsel argued that Defendant's and Mrs. Wright's testimony was relevant to the issue of whether Defendant suffered from drug-induced psychosis and consequently was incapable of deliberating on the murder of Mr. Shaw. Defendant did not argue at trial or in his motion for new trial that evidence of voluntary drug use was relevant to explaining his conduct. "A defendant may not claim error on an evidentiary issue on a theory not presented to or decided by the trial court." *State v. Hill*, 250 S.W.3d 855, 858 (Mo.App. S.D.2008).

■■■ Furthermore, Defendant failed to develop this argument in his brief. Defendant neither explained how voluntary intoxication was relevant to his conduct nor identified the conduct to which voluntary intoxication was allegedly relevant. Nor does the record support Defendant's apparent assertion that he was intoxicated at the time he committed the charged crimes. "An argument is not properly before an appellate court if it merely makes bald assertions of general principles of law and never develops how such principles mandate reversal in the factual context of the particular case." *State v. Mitchell* 41 S.W.3d 574, 578 (Mo.App. S.D.2001). "It is not within our province to speculate about, then decide, arguments which are not asserted or are merely asserted but

---

7.  Section 562.076.3 provides, in pertinent part: "Evidence that a person was in a voluntarily intoxicated or drugged condition may be admissible when otherwise relevant on is-sues of conduct but in no event shall it be admissible for the purpose of negating a mental state which is an element of the offense." Mo.Rev.Stat. § 562.076.3.

not developed." *Id.* Because Defendant failed to develop his argument that the trial court abused its discretion in excluding evidence of voluntary intoxication for the purpose of explaining Defendant's conduct, we deem that claim abandoned.[8] Points denied.

### Conclusion

The judgment of the trial court is affirmed.

LAWRENCE E. MOONEY, P.J., and KURT S. ODENWALD, J., concur.

---

8. Defendant also argued that he was prejudiced by the exclusion of evidence of his mental health history, including auditory hallucinations and prior hospitalizations, because "[w]ithout the addition [of] his prior history ... his claims seemed made-up." As Defendant points out, in the State's closing argument, the prosecutor emphasized the absence of this evidence, saying: "[W]e don't have a single witness to say he's mumbling to himself or doing any of that sort of conduct on October 16, 2008.... Now folks, we've got no witnesses to the voices. We have a remark-

ably convenient story." Although the prosecutor's argument is arguably improper in light of the trial court's rulings prohibiting Defendant from presenting evidence of his mental health history, we note that defense counsel did not object at trial. As a result, the trial court was given no opportunity to rule on this issue, and it is not preserved for our review. *See State v. Letica*, 356 S.W.3d 157, 167 (Mo. banc 2011).